**In re NICHOLAS P.**

[Cite as *In re Nicholas P.*, 169 Ohio App.3d 570, 2006-Ohio-6213.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–06–1051.

Decided Nov. 27, 2006.

Jennifer Fulton Styblo, for appellants.

David T. Rudebock, for appellee.

SINGER, Presiding Judge.

{¶ 1} This appeal comes to us from a judgment issued by the Lucas County Court of Common Pleas, Juvenile Division, which terminated the parental rights of appellants to custody of their minor son. Because we conclude that the trial

court erred in its findings that were the basis for granting permanent custody to the children services agency, we reverse and remand.

{¶ 2} Appellants, Melissa P. and John P., are the parents of Nicholas P., born in August 2005. Prior to the child's birth, Lucas County Children Services ("LCCS") had notice that the couple had previously lost custody of two other children, one in Fulton County and one in Lucas County. On April 18, 2002, Kaylee, born February 6, 2002, was taken into temporary custody by the Fulton County Department of Job and Family Services ("FCDJF") pursuant to allegations of serious injuries to the child. A case plan was created, requiring both parents to undergo psychological evaluations and to participate in various services. While the Fulton County case was still pending, Lauren was born to appellants on April 20, 2003. LCCS took Lauren into custody immediately following birth. On August 28, 2003, LCCS was granted permanent custody of Lauren because of the Fulton County allegations of abuse of the first child, Kaylee.

{¶ 3} In March 2004, FCDJF was granted permanent custody of Kaylee because appellants had lost custody of Lauren and had not completed their case-plan requirements. As a result of those proceedings, 17 months later, LCCS again sought and was granted temporary custody of Nicholas immediately following his birth in August 2005. He was removed from the custody of his parents at the time of his hospital discharge.

{¶ 4} In October 2005, at a combination pretrial and reasonable-efforts-bypass hearing, the juvenile court magistrate granted a motion by LCCS to be excused from making reasonable efforts at reunification of Nicholas and his parents. On December 19, 2005, and January 27, 2006, the court conducted the adjudicatory hearing as to the allegations of the complaint.

{¶ 5} The only witness called by LCCS at adjudication was Holly Matuszak, an LCCS assessment caseworker. She testified that she had interviewed the parents in the hospital immediately following Nicholas's birth. They reported to her that even after Kaylee and Lauren were removed, they had continued attending and had completed parenting and anger-management classes at Unison Behavioral Health Group, Inc. ("Unison") under the old case plan. The mother said that her most recent therapist had told her she had been misdiagnosed as bipolar, but instead was suffering from depression due to the loss of custody of her children. The mother reported that the therapist further said she did not need to continue counseling for bipolar issues. The father reported that the domestic-violence-class instructor said he could not attend the program because domestic-violence charges were no longer pending against him.

{¶ 6} Although a release had been issued to Unison, Matuszak did not obtain information from that services provider. She also acknowledged that she did not

know whether the parents had completed the case-plan services previously requested. The court admitted into evidence copies of the parents' police records, as well as the entire court case records of the two children previously removed from the parents' custody.

{¶ 7} The mother then testified that she and the father were married in April 2004. She stated that under the Fulton County case plan for Kaylee, she was to complete the following services: counseling, parenting classes, drug and alcohol assessment, and an anger-management assessment. She acknowledged that at the time FCDJF was granted permanent custody of Kaylee in March 2004, she had not fully completed all classes and required services. The mother said that she had completed the case-plan requirements well before Nicholas's birth. The mother stated that although the father had been initially referred to domestic-violence classes, this was never an issue between her and the father. She further testified that the father had completed anger-management classes, but not the domestic-violence classes. The court then admitted into evidence a certificate of completion showing that the mother had completed parenting classes as of January 2003 and that she had attended both depression/anxiety-management classes and individual therapy sessions. Documents were admitted showing that the father had also attended parenting classes and anger-management group sessions.

{¶ 8} Ultimately, the trial court adjudicated Nicholas to be a dependent child and proceeded directly to disposition. At the disposition phase, LCCS again called only one witness. Kelly Crampton, an LCCS caseworker, testified that Nicholas has no special needs, that he is developmentally on target, and that the mother and father continue to visit him every week. She further stated that as requested for Nicholas's case plan, the father had completed an assessment at Unison, a counseling and mental-health-therapy provider, on September 21, 2005. Crampton stated that the father had been referred for 24 individual sessions of batterer's intervention therapy, but she had no further information, and she had never contacted Unison about his participation. She also stated that appellants had talked with a pastor once and had been regularly attending a church parent-counseling group.

{¶ 9} When asked specifically about former case-plan requirements, Crampton stated that she had "no idea" what those requirements were or whether appellants had completed them. It was her "understanding," however, that appellants had not completed them, and that was why Kaylee and Lauren had been permanently removed from their custody.

{¶ 10} The guardian ad litem also stated on the record that the "mother and father seem like nice people. They really do." She said, however, that she was bothered about the injuries to Kaylee in 2002, and did not know whether

appellants could "admit" anything about what had happened back then. She noted that she had also checked the father's arrest record. The domestic-violence and assault charges referred to earlier in the proceedings had, in fact, been dismissed. Nevertheless, she stated that she did not think appellants were "ready to get their baby."

{¶ 11} The court ultimately determined on disposition that permanent custody of Nicholas should be granted to LCCS. The court stated again that the reasons were because appellants "have lost custody of two older children involuntarily," and they "have not sought out, successfully engaged in, or successfully completed any services that led to the termination of parental rights of their older children."

{¶ 12} Appellants now appeal from that judgment, arguing the following two assignments of error:[1]

{¶ 13} "1. In a permanent custody trial, clear and convincing evidence did not support the court's termination of the parents' parental rights solely on the basis of an uncompleted case plan in a prior case, where one or more of the parents had substantially completed case plan goals since the completion of the prior case.

{¶ 14} "2. The failure of attorneys for parents to raise the completion of services as a defense to the reasonable efforts bypass may be ineffective assistance of counsel."

{¶ 15} In their first assignment of error, appellants essentially argue that the trial court erred in granting permanent custody because clear and convincing evidence was not presented to support the trial court's finding that the parents had failed to remedy the conditions that caused the child to be removed from their custody. Specifically, appellants assert that the basis of the trial court's determination that they failed to complete their case plan was unsupported by the evidence. We agree.

{¶ 16} Under the United States Constitution, parents have a protected fundamental interest in the care, custody, and management of their children. *Santosky v. Kramer* (1982), 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599; *Troxel v. Granville* (2000), 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49. The Supreme Court of Ohio has also recognized the essential and basic rights of a parent to raise his or her child. *In re Hayes* (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680, citing *In re Murray* (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169. "Permanent termination of parental rights has been described as 'the family law

---

1. We note that the numbered paragraphs designated in appellants' brief as "Issues Presented for Review" are written in the format of assignments of error. Therefore, we have listed those, rather than the questions presented, as issues under the heading of "Assignments of Error." In addition, we will not address appellants' third assignment of error, which was stricken.

equivalent of the death penalty in a criminal case.'" Id., quoting *In re Smith* (1991), 77 Ohio App.3d 1, 16, 601 N.E.2d 45. Accordingly, parents must receive every procedural and substantive protection the law permits. Id. "Because an award of permanent custody is the most drastic disposition available under the law, it is an alternative of last resort and is only justified when it is necessary for the welfare of the children." *In re Swisher*, 10th Dist. No. 02AP–1408, 2003-Ohio-5446, 2003 WL 22331995, ¶ 26, citing *In re Cunningham* (1979), 59 Ohio St.2d 100, 13 O.O.3d 78, 391 N.E.2d 1034. A parent's right to raise his or her children is an "essential" and "basic" civil right. *In re Murray* (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169.

{¶ 17} Nevertheless, a parent's fundamental rights are always subject to the ultimate welfare of the child. *In re Cunningham*, 59 Ohio St.2d at 106, 13 O.O.3d 78, 391 N.E.2d 1034. Thus, in certain circumstances, the state may terminate the parental rights when necessary for the best interest of the child. *In re Wise* (1994), 96 Ohio App.3d 619, 624, 645 N.E.2d 812. If a parent has ever had a child involuntarily removed, a subsequently born child may be automatically deemed "dependent" from birth. See *In re Turner Children*, 5th Dist. No. 2006CA00062, 2006-Ohio-4906, 2006 WL 2708458; *In re Melchizedek M.*, 6th Dist. No. L–05–1379, 2006-Ohio-3062, 2006 WL 1667708.

{¶ 18} A prior adjudication of permanent custody, however, simply should not and does not constitute a de facto termination of parental rights as to later born children. See *In re Sheffey*, 167 Ohio App.3d 141, 2006-Ohio-619, 854 N.E.2d 508. To allow such an outcome would amount to a violation of parents' basic rights to raise their children. Id. As we noted previously, parents hold a well-established fundamental liberty interest in the care, custody, and management of their children. *Santosky v. Kramer* (1982), 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599. The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the state. Id. at 753, 102 S.Ct. 1388, 71 L.Ed.2d 599. "With this in mind, it is evident that a parent maintains those rights as to each and every child born to him or her, regardless of order of birth or prior acts." *In re Sheffey*, 167 Ohio App.3d 141, 2006-Ohio-619, 854 N.E.2d 508, ¶ 22.

{¶ 19} R.C. 2151.35(A)(1) provides:

{¶ 20} "If the court at the adjudicatory hearing finds from clear and convincing evidence that the child is an abused, neglected, or dependent child, the court shall proceed, in accordance with division (B) of this section, to hold a dispositional hearing and hear the evidence as to the proper disposition to be made under section 2151.353 of the Revised Code."

{¶ 21} R.C. 2151.04 defines "dependent child" as any child:

{¶ 22} "(A) Who is homeless or destitute or without adequate parental care, through no fault of the child's parents, guardian, or custodian;

{¶ 23} "(B) Who lacks adequate parental care by reason of the mental or physical condition of the child's parents, guardian, or custodian;

{¶ 24} "(C) Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship;

{¶ 25} "(D) To whom both of the following apply:

{¶ 26} "(1) The child is residing in a household in which a parent, guardian, custodian, or other member of the household committed an act that was the basis for an adjudication that a sibling of the child or any other child who resides in the household is an abused, neglected, or dependent child.

{¶ 27} "(2) Because of the circumstances surrounding the abuse, neglect, or dependency of the sibling or other child and the other conditions in the household of the child, the child is in danger of being abused or neglected by that parent, guardian, custodian, or member of the household."

{¶ 28} In this case, the court adjudicated Nicholas a dependent child, finding that caseworker Matuszak had "discovered that neither [parent] had successfully engaged in or completed any mental health services that would alleviate the issues that led to the termination of their parental rights with respect to the two children previously discussed." Our review of the record reveals that the court's findings are unsupported by the evidence and testimony presented.

{¶ 29} Unchallenged evidence was presented that the parents did, in fact, complete parenting and anger-management classes as directed by their prior case plan. The father's Unison records indicate that he attended group-therapy sessions for several months. Nothing in the record contradicts that information. The mother further testified that she attended individual mental-health therapy at Unison relating to the original evaluation and bipolar diagnosis, but was later told by her therapist that she had been misdiagnosed. The mother also provided written documentation regarding her therapy and parenting-class participation and completion of services. Again, nothing in the record indicates that this information is untrue.

{¶ 30} Evidence presented at the adjudicatory and dispositional hearings revealed that LCCS did not conduct any real investigation into the parents' fitness when it first decided to take Nicholas into custody. Holly Matuszak, the investigative-agency caseworker, testified that at the hospital, the mother related that she had, in fact, completed parenting classes pursuant to the Fulton County

case plan, despite the fact that Kaylee was not returned to the parents. Matuszak also acknowledged that the mother had informed her that, according to her therapist at Unison, the mother had been misdiagnosed in Fulton County as bipolar, resulting in the canceling of her therapy. The father told her that he had also been "going through services at Unison," but that the domestic-violence class instructor had said that he could no longer attend because the charge had been dropped.

{¶ 31} When questioned about her investigation regarding what the parents had told her, Matuszak specifically noted that although she had sent releases to Unison, she did not wait to get information as to the services that the mother and father had completed. She also acknowledged that she did not follow up to determine whether the mother's therapist had released her from attending individual therapy sessions or even whether such services remained necessary. Although the caseworker had new information and three years had passed since the first evaluation had been performed, nothing in the record indicates than a new psychological evaluation was ever considered or sought.

{¶ 32} The only other evidence submitted regarding the parents' alleged failure to remedy was in the form of court records from cases that had occurred two to three years before Nicholas was born. The court relied on psychological evaluations of the parents conducted in 2002, which referred to a different child and a different set of facts. Although those earlier evaluations stated that it might take two to three years for the mother and father to make progress, by the time Nicholas was born, three years had passed. LCCS never explored the possibility that the mother was, in fact, misdiagnosed as bipolar. At the very least, a new psychological evaluation was warranted with current findings as to the continued unsuitability of the parents to care for the child.

{¶ 33} The information relied upon by the trial court was either inconclusive or related to a period 17 months to three years prior to Nicholas's birth. No other current evidence or testimony was presented by LCCS to provide any further explanation as to why Nicholas should be deemed dependent. The trial court based its dependency determination solely on the fact that appellants had lost custody of the first two children and on information that was not relative to the parents' unfitness at the time Nicholas was removed. Therefore, we conclude that the trial court's finding that the parents had failed to remedy the conditions that had led to the child's removal was unsupported by clear and convincing evidence.

{¶ 34} We are also troubled that under the facts of this case, the trial court granted LCCS's request that it not be required to provide any services to the parents or show reasonable efforts to prevent the child's continued removal. We are aware that R.C. 2151.419(A)(2)(e) provides that when a parent has

previously had parental rights involuntarily terminated with respect to a sibling of the child, the court is mandated to make a "determination that the agency is not required to make reasonable efforts to prevent the removal of the child from the child's home, eliminate the continued removal * * *, and return the child to the child's home." Nevertheless, R.C. 2151.419(A)(3) states:

{¶ 35} "At any hearing in which the court determines whether to return a child to the child's home, the court may issue an order that returns the child in situations in which the conditions described in divisions (A)(2)(a) to (e) of this section are present."

{¶ 36} Thus, the statute provides the trial court with the discretion to override the mandate of R.C. 2151.419(A)(2)(e). Without this override provision, any parent who had ever involuntarily lost permanent custody of a child, regardless of his or her current fitness and ability to parent, would forever be presumptively denied the benefit of the efforts by the agency to work for reunification or other warranted services.

{¶ 37} The record indicates that the "bypass" in this case was granted primarily, again, because the parents had previously lost custody of another child, and also because the father allegedly had domestic-violence charges pending. Although we acknowledge that police records may be an indicator of parental fitness in some cases, the guardian ad litem noted that the charges were ultimately dismissed and were based on an incident between appellant and his stepfather at another residence that did not involve the mother or any child.

{¶ 38} In short, because the caseworkers knew that the parents had lost custody of two other children in the past, LCCS presumed the parents unfit, took custody of the child, and never considered reunification as a possible goal. Additionally, the caseworkers did not pursue discovery of information regarding the completion of services or whether the parents were now capable of taking care of Nicholas. Instead, they relied solely on the fact that the parents had lost custody of two other children. Even before talking with or conducting a true assessment of the parents, LCCS presumed the parents to be unfit and slotted this case as an automatic, fast-track, permanent-custody action. The agency did not attempt to reunify the child with the parents or even to determine whether the parents had, in fact, progressed in any way. Consequently, because there was evidence that appellants had continued in and arguably benefited from services, the trial court erred in finding that LCCS was not required to provide services or make reasonable efforts to prevent the child's continued absence from his home.

{¶ 39} Therefore, we conclude that the trial court erred in finding Nicholas to be dependent because the agency failed to provide current, affirmative evidence of the parents' unfitness and inability to care for the child. Accordingly,

appellants' first assignment of error is well taken. Appellants' second assignment of error is deemed moot.

{¶ 40} The judgment of the Lucas County Court of Common Pleas, Juvenile Division, is reversed as to the adjudication and disposition of permanent custody, and the cause is remanded to the trial court to conduct a new hearing on the complaint within the mandates of procedural due process and R.C. Chapter 2151 and in accordance with this decision. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.

Judgment reversed
and cause remanded.

HANDWORK and PARISH, JJ., concur.