OPINION
{¶ 1} Although originally placed on our accelerated calendar, we have elected pursuant to Loc. R. 12(5) to issue a full opinion in lieu of a summary journal entry.
 A. Facts Procedural Posture {¶ 2} Defendant-appellant, Teresa Ridenour (hereinafter "Teresa"), appeals the judgment of the Allen County Court of Common Pleas, Juvenile Division awarding the plaintiff-appellee, Allen County Children Services Board (hereinafter "ACCSB"), permanent custody of her child. For the reasons that follow, we affirm. *Page 3 
 {¶ 3} On December 19, 2007, ACCSB filed a complaint alleging that Austin was a dependent, neglected, and abused child and seeking permanent custody. On February 28 and 29 of 2008, the trial court conducted hearings on the complaint. On March 7, 2008, the trial court issued a judgment entry finding Austin to be a dependent, but not abused or neglected, child and set the matter for a dispositional hearing on March 17, 2008. That same day, ACCSB filed a motion claiming that it was not required to show reasonable reunification efforts pursuant to R.C. 2151.419(A)(2).
 {¶ 4} On March 17, 2008, a hearing was held in regards to both ACCSB's motion and disposition. On April 17, 2008, the trial court issued its judgment finding that ACCSB was not required to demonstrate reasonable reunification efforts, because Teresa had previously had her parental rights involuntarily terminated with respect to three (3) other half-siblings. Furthermore, the trial court granted permanent custody of Austin to ACCSB and terminated Teresa's parental rights.[1]
 {¶ 5} Teresa now appeals the trial court's judgment and raises four assignments of error. *Page 4 
 B. Standard of Review/Rules of Law {¶ 6} The right to raise one's child is an "essential" and basic "civil right." In re Murray (1990), 52 Ohio St.3d 155, 157,556 N.E.2d 1169, citing Stanley v. Illinois (1972), 405 U.S. 645, 651,92 S.Ct. 1208, 31 L.Ed.2d 551; Meyer v. Nebraska (1923), 262 U.S. 390, 399,43 S.Ct. 625, 67 L.Ed. 1042. A parent who is a suitable person has a "paramount" right to the custody of their child. Id., citing In rePerales (1977), 52 Ohio St.2d 89, 97, 369 N.E.2d 1047; Clark v.Bayer (1877), 32 Ohio St. 299. As a result, "[p]arents have a `fundamental liberty interest' in the care, custody, and management of their children," and when the state seeks permanent custody of the child, it must act in accordance with the due process guarantees provided in the U.S. and Ohio Constitutions. In re ShaefferChildren (1993), 85 Ohio App.3d 683, 689-90, 621 N.E.2d 426, citingSantosky v. Kramer (1982), 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599.
 {¶ 7} When considering a motion for permanent custody, the Ohio Revised Code sets out a two-prong test that a trial court must follow in its evaluation. In re Franklin, 3d Dist. Nos. 9-06-12, 9-06-13, 2006-Ohio-4841, ¶ 12. A trial court may grant permanent custody of a child to the agency if it determines, by clear and convincing evidence, that (1) one of the four factors listed in R.C. 2151.414(B)(1)(a)-(d) applies, and (2) that it is in the "best interest of the child." R.C. 2151.414(B)(1). *Page 5 
 {¶ 8} In order to award permanent custody to an agency, the trial court must find one of the four factors listed in R.C. 2151.414(B)(1) exists; these include:
 (a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 (b) The child is abandoned.
 (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
 (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
 {¶ 10} To determine whether a child cannot be placed with either parent within a reasonable time or should not be placed with either parent, R.C. 2151.414(E) provides, in pertinent part:
 [T]he court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.535 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
 * * * *Page 6 
 (2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;
 * * *
 (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
 * * *
 (11) The parent has had parental rights involuntarily terminated pursuant to this section or section 2151.353 or 2151.415 of the Revised Code with respect to a sibling of the child.
 {¶ 11} Finally, to determine whether transferring permanent custody to the agency is in the `best interests of the child,' R.C. 2151.414(D) provides a nonexclusive list of factors for the trial court to consider:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public *Page 7 children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 (5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
 {¶ 12} A trial court must find that clear and convincing evidence exists as to each of the above two prongs when it grants permanent custody to the agency. Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." In re Smith, 3d Dist. No. 9-04-35, 2005-Ohio-149, ¶ 36, quoting Cross v. Ledford (1954), 161 Ohio St. 469, 477, 120 N.E.2d 118, citations omitted. Upon review, "when `the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.'" Id.
 C. Analysis ASSIGNMENT OF ERROR NO. I The Trial Court committed error by awarding permanent custody of the minor child to the Allen County Children Services Board and terminating the parental rights of the appellant mother in violation of her rights to due process and against the manifest weight of the evidence. *Page 8 
 {¶ 13} In her first assignment of error, Teresa argues that the trial court erred by basing its decision only on her limited intellectual functioning, the involuntary termination of her parental rights with regard to her prior three children, and Austin's medical condition. In addition, Teresa claims that the only evidence ACCSB presented was from the on going caseworker who never tied Austin's medical condition to Teresa's limited intellectual functioning abilities. Furthermore, Teresa argues that she never had the opportunity to become educated about Austin's medical condition because it was discovered subsequent to his temporary removal.
 {¶ 14} In regards to Teresa's argument that the trial court's decision was against the manifest weight of the evidence, this Court has previously stated:
 The decision of a trier of fact relating to a motion for permanent custody of children will not be overturned, so long as the record contains competent credible evidence from which the trial court could have formed a firm belief or conviction that the essential statutory elements have been established. In the Matter of Lawson/Reid Children (April 18, 1997), Clark App. No. 96-CA-0010. Furthermore, it must be noted that this Court must defer to "the trial court's findings of fact and rely on its ability to evaluate the credibility of the witnesses." State v. Anderson (1995), 100 Ohio App.3d 688, 691, 654 N.E.2d 1034.
In re Franklin, 2006-Ohio-4841, at ¶ 21. Thus, we must determine whether the record contains competent, credible evidence from which the trial court could have formed a firm belief or conviction that the essential statutory elements were met, *Page 9 
not whether, the decision was against the manifest weight of the evidence as Teresa argues. Based on the following analysis, we find that the trial court's findings were supported by sufficient evidence.
1. The Trial Court's Findings
 {¶ 15} After considering all of the evidence, the trial court found that Austin could not be placed with either parent within a reasonable period of time and should not be placed with either parent (as enumerated under R.C. 2151.414(B)(1)(a)), and that it was in Austin's best interest to grant permanent custody to ACCSB. (Mar. 17, 2008 JE at ¶¶ 9, 12). In support of its determination that Austin could not be placed with Teresa within a reasonable time and should not be placed with Teresa, the trial court cited R.C. 2151.414(E)(2) and (E)(11). To support its conclusion under R.C. 2151.414(B)(1)(a), the trial court made the following findings of fact:
 6.) Teresa Ridenour is the mother of April Nichols, Roy Nichols, Jr., and Victor Nichols, all of whom are half-siblings of Austin Robinson. April Nichols was placed in the permanent custody of Allen County Children Services Board and the parental rights of her mother, Teresa Ridenour, were involuntarily terminated, * * * Roy Nichols, Jr. was placed in the permanent custody of Allen County Children Services Board and the parental rights of his mother, Teresa Ridenour, were involuntarily terminated, * * * Victor Nichols was placed in the permanent custody of Allen County Children Services Board and the parental rights of his mother, Teresa Ridenour, were involuntarily terminated, * * *. *Page 10 
 7.) The minor child the subject of this proceeding has been found to have a serious congenital heart condition and was just recently released from Nationwide Children's Hospital in Dayton, Ohio, where he had been hospitalized for pneumonia and congestive heart failure. The minor child has significant medical issues requiring specialized care and medication. He is currently placed in a treatment foster home to meet his specialized needs.
 8.) The mother has limited intellectual functioning and personality disorders that inhibit her ability to cope with day-today situations and which interferes with her ability to protect and provide for the minor child. Additionally, she is resistant to any assistance offered to her. The mother's level of functioning makes it difficult for her to identify and anticipate problems and placement of the child with the mother could place him at potential risk of harm. In sum, the child has extraordinary medical needs which require a parent of at least average skills, and the mother has parenting skills which are significantly below average.
 {¶ 16} To support its finding that it was in Austin's best interest to award permanent custody to ACCSB, the trial court relied on the non-exclusive factors listed in R.C. 2151.414(D). The trial court made the following findings of fact to support its "best interest" determination:
 10.) Upon consideration of all relevant factors enumerated in Ohio Revised Code Section 2151.414(D), the Court finds that although the child is too young to express his wishes, the Guardian Ad Litem has recommended it to be in his best interest that permanent custody be awarded to Allen County Children Services Board. Additionally, the child's needs of a legally secure permanent placement cannot be achieved without a grant of permanent custody to the agency. There are no suitable relatives with whom the child can be placed. *Page 11 
 11.) The Guardian Ad Litem's written report and recommendation to the Court recommends the child be placed in the permanent custody of Allen County Children Services Board, as same would be in the child's best interests.
2. Trial Court's R.C. 2151.414(E) analysis
 {¶ 17} Teresa argues that the trial court failed to meets its burden when it based its decision only on Teresa's limited intellectual functioning, the involuntary termination of her parental rights with regards to her prior three children, and the medical condition of Austin. In addition, Teresa claims that the only evidence presented by the ACCSB was from the on going caseworker who never tied Austin's medical condition to Teresa's limited intellectual functioning abilities.
 {¶ 18} First, with respect to Teresa's argument that ACCSB only presented evidence from the case worker, we find that this argument lacks merit. During the dispositional hearing, the State moved the court to take judicial notice of all of the evidence that had been presented previously during the adjudicatory hearing. (Mar. 17, 2008 Tr. at 32-33). The trial court ruled that it would consider the evidence presented at the adjudication hearing for disposition. (Id. at 33). There were no objections made by defense counsel. (Id. at 32-33). This Court has previously held that a trial court can take judicial notice of the prior proceedings in the immediate case. State v. Velez (1991),72 Ohio App.3d 836, 838, 596 N.E.2d 545. Therefore, even though the only testimony put on by ACCBS at the *Page 12 
dispositional hearing was from the case worker, the trial court took judicial notice of the evidence presented at the adjudication hearing.
 {¶ 19} Second, with regard to the number of factors required to be found under R.C. 2151.414(E), this Court has stated that "given the plain language of the statute, the trial court only needs to findone of the factors listed in (E) as to each parent before it `shall' render a finding that a child cannot be placed with either parent."In re Matthews, 3d Dist. Nos. 9-07-28, 9-07-29, 9-07-34, 2008-Ohio-276, ¶ 26 (emphasis in original). Here, the trial court found that (E)(2), (E)(4), and (E)(11) existed. After reviewing the record, we find that there is sufficient evidence to support each of those findings.
a. R.C. 2151.414(E)(2)
R.C. 2151.414(E)(2) allows a court to consider:
 Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing
At the adjudication hearing, ACCSB presented expert testimony from Dr. Hustak for purposes of rendering an opinion as to Teresa's mental state, cognitive ability, and ability to care for Austin in a developmentally appropriate way. (Feb. 28, 2008 Tr. at 124). Dr. Hustak had performed an evaluation on Teresa two years ago when she had first been referred to his office by ACCSB in regards to her *Page 13 
three previous children. (Id. at 126). Based on his evaluation, he concluded that Teresa had "limited intellectual functioning," and at that time, also "had problems with depression that was chronic, and several personality problems that got in the way of her ability to cope with the world as well as * * * being able to provide for some adequate protection and decision making for the children." He called this limited intellectual functioning problem a "static feature," meaning Teresa was "not going to get better." (Id. at 148). While Dr. Hustak admitted on cross-examination that participating in regular counseling and possibly some medications would "make her feel better," those dynamic factors would not be sufficient, accurate, or big enough to overcome the intellectual functional limitations. (Id. at 172-73).
 {¶ 20} In addition to Teresa's limited intellectual functioning, there was also evidence presented regarding Austin's medical condition. During the December 12, 2007 shelter care hearing, it was discovered that Austin's foster care parents had taken him to a cardiologist. (Dec. 12, 2007 Tr. at 4). The cardiologist determined that Austin's heart condition was more serious than just a heart murmur. (Id. at 4). Consequently, Austin was taken to a Toledo hospital and placed in intensive care on January 29, 2008. (GAL Rec, Doc. No. 37 at 2). *Page 14 
Besides the "hole in his heart," he was diagnosed as having "RVS," [sic][2] pneumonia, and congestive heart failure, and therefore, had to be placed in an induced coma. (Id.). Because of Austin's medical needs, he was transferred from his original "regular" foster parents to a special "treatment" foster home equipped to handle his medical needs. (Mar. 17, 2008 Tr. at 7). As of the date of the dispositional hearing, Austin had been returned to his "treatment foster home." (Id. at 8). Austin was taking three different medications: Lasix, a medication designed to prevent the development of fluid in Austin's heart and lungs; a breathing treatment medication, to treat his respiratory infection; and Albuterol, designed for situations of respiratory distress. (Id.). Moreover, Austin now needs to have surgery sometime within the next two years to repair the damage to his heart. (Id. at 28). While doctors were in disagreement as to the cause of Austin's pneumonia, there was no evidence to indicate Teresa had been the cause of any of Austin's medical problems. (GAL Rec, Doc. No. 37 at 2); (Mar. 17, 2008 Tr. at 13).
 {¶ 21} Teresa argues that there was no evidence to connect her limited intellectual functioning to Austin's medical condition; however, Dr. Hustak testified: *Page 15 
 Q. You mentioned the previous case she had a child with some special . . . I'll use the term "special needs". I don't know if that's the term you used; but had some health issues? A. Yes.
 Q. I'll represent to you that prior testimony today eludes to the fact that Austin has some health issues particularly a heart murmur and some other more significant health issues. Does the fact that Austin has heart murmur and health issues that need care reinforce your opinions or your opinion that Teresa will not and cannot parent in a developmentally appropriate way? A. With the caution extended to the Court that I have not seen Austin and evaluated Austin individually. Q. I understand.
 A. With that caution being extended so that my testimony is clear [sic] concentrating upon Teresa, the answer would be it would be extremely difficult. I would be very surprised to be blunt that she would be able to respond to that because she wasn't able to respond to that several years ago and she has functional limitations.
 Q. Based on your education, experience, and background, and your evaluation of Teresa, do you have an opinion based upon a reasonable degree of psychological certainty that Teresa can provide Austin with adequate parental care? * * *
 A. My opinion would be, again with the caution extended to the Court, that I did not evaluate her child . . . evaluate her interaction with the child; but with that emphasis on what Teresa was capable of doing at the time that I saw her, it would be my opinion that it would be extremely difficult and practically comes very close to nonexistent or certainly not highly unlikely that she would be able to successfully do that because she would be asking her to develop some abilities that she simply does not have.
(Feb. 28, 2008 Tr. at 154-56). Dr. Hustak also testified that Teresa would not be able to provide the minimum level of parental competence, "especially if a child had certain needs that were special needs." (Id. at 157). In addition, he stated that *Page 16 
Teresa would create a substantial risk to Austin's health and safety because it would be extremely difficult for her to identify anticipated problems for Austin when she had difficulty doing that for herself. (Id. at 157-58).
 {¶ 22} Teresa further argues that she never had an opportunity to take care of Austin's medical problems because his medical condition was not discovered until after ACCSB took Austin away. Teresa testified that she would be able to handle Austin's medical condition, that she would discuss Austin's medical conditions with his doctors, and that she would set a schedule for giving Austin his medication. (Mar. 17, 2008 Tr. at 59, 62). However, there was evidence presented to demonstrate that even without Austin's medical condition, Teresa was not able to provide an adequate permanent home.
 {¶ 23} During the adjudication hearing, there was testimony from an ACCSB case worker about her initial involvement with Austin and Teresa on September 17, 2007. (Feb. 28, 2008 Tr. at 59). According to the case worker, Teresa had taken Austin to the hospital after he had been injured by a dog. (Id. at 59). Teresa admitted the incident to the case worker and told her that it was her roommate's dog. (Id. at 60). The case worker told Teresa that she needed to get rid of the dog because it had already injured Austin. (Id. at 60-61). The case worker admitted that Teresa had sufficient space for Austin, that her place was clean, and that she had never seen the dog during any of the home visits. (Id. at *Page 17 
81-82). In fact, the case worker testified she would not have known about the dog had it had not been for Teresa coming to her office on October 15, 2007 and admitting to her that the dog was back in the house. (Id. at 62). But, since the dog was back in the home, ACCSB decided to remove Austin from the home. (Id. at 63).
 {¶ 24} A pediatric nurse practitioner testified that she had met with Teresa right after Austin was born. (Id. at 10). Even though Austin was gaining weight, she testified that after meeting with Teresa she was concerned with Austin's nutrition. (Id. at 29, 35). She was also concerned with Teresa's decision to co-sleep with Austin, which she stated increased the child's risk for sudden infant death syndrome. (Id. at 29-30). In addition, she was also concerned with Teresa's level of forgetfulness and her resistant attitude to offers of assistance. (Id. at 30-31).
 {¶ 25} ACCSB admitted that Teresa had never been offered the opportunity to take parenting classes under their case plan with Austin. (Mar. 17, 2008 Tr. at 11-12). However, an ACCSB case worker stated that even if Teresa would have been offered counseling and parenting classes, it would not have made a difference because Teresa had not benefited from the services when they were offered during the case plan for her three previous children. (Id. at 12). Teresa testified that she would have continued the counseling and parenting classes, but *Page 18 
that she was not allowed to because she had lost her children. (Id. at 46). Nevertheless, the case worker testified that Teresa was the "same person to work with now that she was then," and because of Teresa's constant unwillingness to take direction from any of the ACCSB agents, she would again not benefit from any of their services. (Id. at 12).
 {¶ 26} Based on our review of the evidence in the record, we find that there was competent, credible evidence to support the trial court's finding that Teresa had limited intellectual functioning. There was also competent, credible evidence for the trial court to find Austin had serious medical problems. Furthermore, there was competent, credible evidence that linked his medical conditions with Teresa's limited intellectual functioning abilities. Moreover, even though Austin's medical condition was not revealed until after he was taken from Teresa, there were already concerns with Teresa's ability to protect Austin from their home environment. Thus, after a review of all of the evidence, we find that the trial court had clear and convincing evidence to find that Teresa's limited intellectual functioning and personality disorders made her unable to provide an adequate, permanent home for Austin at the present time and, as anticipated, within one year of the date of the hearing.
 b. R.C. 2151.414(E)(11) *Page 19 
 {¶ 27} The trial court further cited R.C. 2151.414(E)(11) as grounds to support its determination that Austin could not be placed with either parent. R.C. 2151.414(E)(11) allows the trial court to make this determination when a party's parental rights were previously involuntarily terminated as to other children.
 {¶ 28} During the adjudicatory hearing, ACCSB introduced into evidence the journal entry from this Court affirming the grant of permanent custody to ACCSB in the matter of Teresa's three prior children. (Feb. 28, 2008 Tr. at 185); (Plaintiffs Ex. 4-A). ACCSB also introduced into evidence the Allen County Court of Common Pleas, Juvenile Division's judgment entries in the matters of Teresa's three prior children. (Feb. 28, 2008 Tr. at 189); (Plaintiffs Exs. 4-B, 4-C, 4-D). These judgment entries all granted ACCSB permanent custody of Teresa's three prior children. (Id.). Aside from the judgment entries, an ACCSB case worker testified that Teresa's other children were placed in ACCSB's permanent custody. (Mar. 17, 2008 Tr. at 10).
 {¶ 29} After a review of the evidence in the record relating to the prior involuntary termination of Teresa's parental rights, we find that there is competent, credible evidence to support the trial court's findings.
c. R.C. 2151.414(E) Conclusion
 {¶ 30} The trial court's (E)(2) and (E)(11) findings are supported by competent, credible evidence. Again, the trial court only had to find clear and *Page 20 
convincing evidence to "one" of the subdivisions in R.C. 2151.414(E) as to each parent. In re Matthews, 2008-Ohio-276, at ¶ 26. Therefore, this Court finds there was clear and convincing evidence as to the trial court's determination that Austin could not be placed with either parent within a reasonable period of time and should not be placed with either parent.
3. Trial Court's R.C. 2151.414(D) analysis
 {¶ 31} Under the statutory two-prong test prescribed under R.C. 2151.414(B)(2), the trial court must also find that permanent custody to the agency is in the best interest of the child. R.C. 2151.414(D) lays out the non-exclusive list of factors for a court to consider when making this determination. This Court has previously stated "[i]n rendering its judgment, the trial court must either specifically address each of the required considerations set forth in R.C. 2151.414(D) in its judgment entry, or otherwise provide some affirmativeindication in the record that the court has considered the specific factors listed in R.C. 2151.414(D)." (Emphasis added). In reMcMillin, 171 Ohio App.3d 686, 2007-Ohio-2046, 872 N.E.2d 975, ¶ 12, citing In re D.H., 3d Dist. No. 9-06-57, 2007-Ohio-1762, ¶ 19. Here, the trial court made the following findings in connection to the factors in (D):
 10.) Upon consideration of all relevant factors enumerated in Ohio Revised Code Section 2151.414(D), the Court finds that although the child is too young to express his wishes, the Guardian Ad Litem has recommended it to be in his best *Page 21 interest that permanent custody be awarded to Allen County Children Services Board. Additionally, the child's need of a legally secure permanent placement cannot be achieved without a grant of permanent custody to the agency. There are no suitable relatives with whom the child can be placed.
 11.) The Guardian Ad Litem's written report and recommendation to the Court recommends the child be placed in the permanent custody of Allen County Children Services Board, as same would be in the child's best interests.
 12.) Having considered all relevant factors enumerated in Ohio Revised Code Section 2151.414(D), granting permanent custody to the Allen County Children Board is in the best interests of the child. The agency has reasonable expectation of placing the child for adoption if committed to the permanent custody of Allen County Children Services Board.
 {¶ 32} Reviewing the journal entry herein, we are persuaded that the trial court's application of specific factors with citations to its findings of fact is an "affirmative indication" that the court has considered the R.C. 2151.414(D) factors. In addition, based on the evidence already presented above, there was sufficient competent, credible evidence to support the trial court's finding that it was in the best interest of Austin to grant ACCSB permanent custody. In particular, there was the GAL's written recommendation (GAL Rec. Doc. No. 37), the GAL's hearing recommendation (Mar. 17, 2008 Tr. at 77-78), Teresa's testimony regarding the absence of suitable relatives/friends (Id. at 59), and the testimony regarding Teresa's limited intellectual functioning and Austin's serious medical conditions (Feb. 28, 2008 Tr. at 154-58); (GAL Rec., Doc. No. 37 at 2). *Page 22 
After a review of the entire record, we find that there was competent, credible evidence to support the trial court's findings that giving ACCSB permanent custody was in Austin's best interest.
4. R.C. 2151.414 Conclusion
 {¶ 33} Overall, we find that there was sufficient evidence for the trial court to find that Austin could not have been placed with either parent within a reasonable amount of time and should not have been placed with either parent, and that it was in Austin's best interest to grant ACCSB permanent custody.
5. Due Process Violation
 {¶ 34} As a final matter, Teresa claims that her due process rights were violated; however, as stated above, the trial court properly and fully complied with the statutory requirements. Moreover, Teresa had notice and an opportunity to attend all of the hearings concerning Austin's removal. See In re D.P., 8th Dist. Nos. 86271, 86272,2006-Ohio-937, ¶ 22, citing In re Sprague (1996), 113 Ohio App.3d 274,276, 680 N.E.2d 1041. In fact, the only hearing which she did not attend was the initial shelter care hearing held on December 21, 2007. (Dec. 12, 2007 Tr. at 2). Nevertheless, Teresa was represented by counsel at the hearing, and counsel informed the court that he had spoken to Teresa about the hearing and that she was aware of it. (Id. at 2). At all subsequent hearings, Teresa was present and given an opportunity to speak, which she exercised at both the adjudication *Page 23 
and dispositional hearings. (Feb. 28, 2008 Tr. at 193); (Mar. 17, 2008 Tr. at 34). Therefore, we find that there was no violation of Teresa's due process rights. In re D.P., 2006-Ohio-937, at ¶¶ 22-24.
 {¶ 35} Teresa's first assignment of error is, therefore, overruled.
 ASSIGNMENT OF ERROR NO. II The Trial Court committed error by relying on the limited intellectual functioning of the appellant mother in awarding permanent custody of the minor child to the Allen County Children Services Board.
 {¶ 36} In her second assignment of error, Teresa cites In reD.A., 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, where the Court held that "[w]hen determining the best interests of the child under R.C. 2151.414(D) at a permanent-custody hearing, a trial court may not base its decision solely on the limited cognitive abilities of the parents." Teresa argues that the trial court substantially relied on Teresa's limited intellectual and cognitive functioning in awarding ACCSB permanent custody.
 {¶ 37} In the case of In re D.A., the child was initially removed from his parent's home because the mother had requested help in handling her son's aggressive behavior. 2007-Ohio-1105, at ¶ 24. After their son was placed in the agency's temporary custody, the parents were given four objectives in their case plan. Id. The parents completed every aspect of their case plan, except one which was not completed due to the agency's suspension of the class. Id. The trial court *Page 24 
found that the parents did "not demonstrate many of the irresponsible, uncaring, or dangerous characteristics that are regularly evident in many permanent custody cases." Id. at ¶ 26. Further, the trial court found that the child was doing well in school, exhibited appropriate behavior in school, did not show any intellectual limitations, and that his defiant behavior had decreased. Id. at ¶ 28. However, because of the parent's low cognitive skills (they demonstrated IQ levels between 62 and 59), their severe limitations "seriously jeopardize[d]" their child's "healthy, successful future." Id. at ¶ 29. The Fifth District Court of Appeals affirmed the trial court's order granting the agency permanent custody of the child. Id. at ¶ 6. On appeal, the Ohio Supreme Court reversed, stating:
 [d]espite making several findings regarding the parents' limited cognitive abilities, the trial court did not find that appellants were unable to provide an adequate home for D.A. due to their mental retardation, a finding that is required to satisfy R.C. 2151.414(E)(2) (footnote omitted). Furthermore, the evidence does not support a finding that appellants failed to provide D.A. with an adequate permanent home. There is no evidence that he lacked adequate clothing, food, shelter, or care. He performed in school and displayed appropriate behavior.
Id. at ¶ 33. In conclusion, the Court held that terminating parental rights solely on the parents' mental retardation does not comply with R.C. 2151.414. Id. at ¶ 40.
 {¶ 38} Teresa argues that the trial court here focused solely on her limited intellectual functioning, and thus, under In re D.A. the trial court failed to comply with R.C. 2151.414. However, we find In reD.A. distinguishable from Teresa's *Page 25 
case. In the case of In re D.A. there was no other evidence demonstrating a link between the parents' limited cognitive abilities and their ability to provide their child an adequate permanent home. Here, there was different evidence presented which illustrated a link between Teresa's limited intellectual functioning and her ability to provide Austin an adequate permanent home.
 {¶ 39} First, there was evidence that illustrated Teresa's inability to make Austin's living environment a safe environment. After a roommate's dog injured Austin, she was told by ACCSB to get rid of the dog, and her failure to remedy this dangerous situation demonstrated her inability to provide Austin an adequate permanent home. (Feb. 28, 2008 Tr. at 59-63). Second, there were legitimate concerns from a nurse practitioner as to Austin's nutrition, Teresa's seemingly resistant attitude for help, and her refusal to change co-sleeping conduct. (Feb. 28, 2008 Tr. at 29-30).
 {¶ 40} Most importantly was the discovery of Austin's serious medical problems. Not including the hole in Austin's heart (which requires surgery to repair), Austin had to be hospitalized and put into an induced coma to treat his pneumonia, RV, and congestive heart failure. (GAL Rec, Doc. No. 37 at 2). Because of his special medical needs, Austin had to be placed in a special "treatment" foster home rather than a regular foster home. (Mar. 17, 2008 Tr. at 7). Austin could not be placed with just anyone, but needed someone with *Page 26 
experience to take care of him. Austin was on three different medications when he was finally released from the hospital, and even though this condition was not brought to light until after Austin was removed from Teresa's care, Dr. Hustak testified that her limited intellectual functioning would inhibit her from providing Austin with adequate parental care. (Feb. 28, 2008 Tr. at 154-58); (Mar. 17, 2008 Tr. at 7-8). Even though, as evidenced by the GAL's recommendation, there was no question that Teresa is a loving and caring mother, she (along with a regular foster home) is just not capable of providing Austin with an adequate permanent home given his "very stressful medical conditions." (Mar. 17, 2008 Tr. at 78).
 {¶ 41} Furthermore, in In re D.A., the Ohio Supreme Court found the trial court had insufficient evidence to make findings under 2151.414(E)(1) and (E)(2) because the parents had complied with their case plan (see (E)(1)), and there was no evidence linking their limited cognitive abilities to their ability to provide their son with an adequate permanent home (see (E)(2)). 2007-Ohio-1105, at ¶ 39. Here, we have already found that, not only was there competent, credible evidence to support the trial court's findings under (E)(2), there was also competent credible evidence to support the trial court's findings under (E)(11), and its best interest determination under (D). Because of its proper findings under (E)(2) and (E)(11), and (D), the trial court obviously did not rely solely on Teresa's limited intellectual functioning when it granted ACCSB permanent custody over Austin. *Page 27 
 {¶ 42} Teresa's second assignment of error is, therefore, overruled.
 ASSIGNMENT OF ERROR NO. III The Trial Court committed error by awarding permanent custody of the minor child to the Allen County Children Services Agency without proof that reasonable efforts had been used to reunite the family and by allowing the Allen County Children Services Board to "bypass" the reasonable efforts requirement.
 {¶ 43} In her third assignment of error, Teresa argues that the cases of In re C.F., 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, andIn re Nicholas P., 169 Ohio App.3d 570, 2006-Ohio-6213, 863 N.E.2d 1102, stand for the proposition that the complete absence of any efforts by the agency to reunify the family is a violation of her fundamental rights as a parent. She then claims that because the trial court found that ACCSB did not have to show reasonable efforts, it violated this fundamental right.
 {¶ 44} R.C. 2151.419(A)(1), in pertinent part, states:
 Except as provided in division (A)(2) of this section, at any hearing held pursuant to section 2151.28, division (E) of section 2151.31, or section 2151.314, 2151.33. or 2151.353 of the Revised Code at which the court removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency or private child placing agency that filed the complaint in the case, removed the child from home, has custody of the child, or will be given custody of the child has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home. The agency shall have the burden of proving that it has made those reasonable efforts. *Page 28 * * * In determining whether reasonable efforts were made, the child's health and safety shall be paramount.
(emphasis added). We agree that under the Revised Code, the trial court is generally mandated to determine whether the agency has made reasonable efforts to reunify the child with their parent, and that it is up to the agency to prove such reasonable efforts took place. R.C. 2151.419(A)(2), however, provides the following:
 If any of the following apply, the court shall make a determination that the agency is not required to make reasonable efforts to prevent the removal of the child from the child's home, eliminate the continued removal of the child from the child's home, and return the child to the child's home:
 * * *
 (e) The parent from whom the child was removed has had parental rights involuntarily terminated pursuant to section 2151.353, 2151.414, or 2151.415 of the Revised Code with respect to a sibling of the child.
Here, the trial court found that ACCSB did not have to show reasonable reunification efforts on the grounds that Teresa had previously had her parental rights involuntarily terminated. (JE Mar. 17, 2008 at 2). However, Teresa claims that the Ohio Supreme Court case In re C.F.
mandated a showing of reasonable efforts at reunification in permanent custody cases, which included those "narrow circumstances * * * set forth in O.R.C. 2151.419(A)(2)." (Appellant's Brief at 13). However, upon reviewing In re C.F., we are not persuaded that the Ohio *Page 29 
Supreme Court included those narrow circumstances in (A)(2) in its mandatory showing of reasonable efforts.
 {¶ 45} The issue in In re C.F. was "whether the trial court must make an R.C. 2151.419 `reasonable efforts' determination when the agency has filed a motion under R.C. 2151.413 seeking permanent custody."2007-Ohio-1104, at ¶ 36. At the emergency case and temporary custody hearing, the trial court determined that the agency had made reasonable efforts to prevent the children's removal from the home. Id. at ¶ 8. The agency then filed a reunification case plan as to both parents, but almost a year later filed a motion to seek permanent custody of the children. Id. at ¶¶ 11-12. After the permanent custody hearing, the trial court awarded the agency permanent custody of the children. Id. at ¶ 16. The father appealed the decision arguing that the trial court had abused its discretion in concluding that the agency had used reasonable efforts to reunify the family. Id. at ¶ 17.
 {¶ 46} The appellate court reversed and certified a conflict to the Ohio Supreme Court. Id. The Ohio Supreme Court found that by its terms "R.C. 2151.419 appli[ed] only at hearings held pursuant to R.C. 2151.28,2151.31(E), 2151.314, 2151.33, or 2151.353," or only those Revised Code sections explicitly enumerated in the provision. Id. at ¶ 41. However, the Court went on to state that, just because under the plain language of the statute the reasonable efforts showing *Page 30 
is not applicable in R.C. 2151.414 hearings, "except for some narrowlydefined statutory exceptions, the state must still make reasonable efforts to reunify the family during the child-custody proceedings." Id. at ¶ 43 (emphasis added). If the agency has not established such reasonable efforts prior to the hearing on the motion for permanent custody, then it must do so at that time. Id.
 {¶ 47} The holding in In re C.F. is unambiguous. The Ohio Supreme Court did not mean to apply its mandatory reasonable efforts showing to the statutory exceptions in (A)(2). The Court explicitly recognized that "under certain circumstances, the law dispenses with the duty to make reasonable efforts to reunify the family. Under R.C. 2151.419(A)(2), the agency need not make reasonable efforts if the parent * * * had parental rights involuntarily terminated with respect to a sibling of the child at issue." Id. at ¶ 34. The Court was clear that the mandatory reasonable efforts still needed to be met by the state, regardless of the plain language of the provision, "except for some narrowly defined statutory exceptions," meaning those exceptions in (A)(2) the Court had previously mentioned. Id. at ¶ 43.
 {¶ 48} We are also not persuaded with Teresa's interpretation of the holding in In re Nicholas P. In that case, the trial court granted the agency's request to "bypass" the mandatory showing of reasonable efforts to reunify the family on the grounds that the parents had previously had their parental rights *Page 31 
involuntarily terminated. 2006-Ohio-6213, at ¶ 34, citing R.C. 2151.419(A)(2)(e). The appellate court acknowledged that (A)(2)(e) is an exception to the reasonable efforts requirement; however, it also pointed out that there was a provision that provided the trial court with the discretion to override the mandatory exceptions listed in (A)(2). Id. at ¶¶ 35-36.
 {¶ 49} Under R.C. 2151.419(A)(3) it states, "[a]t any hearing in which the court determines whether to return a child to the child's home, the court may issue an order that returns the child in situations in which the conditions described in divisions (A)(2)(a) to (e) of this section are present." Id. at ¶ 35. Under the facts of In re Nicholas P., the appellate court found that the only reason that the "bypass" of the reasonable efforts showing was granted was because the parents had previously had their parental rights involuntarily terminated in the past. Id. at ¶ 37. In fact, there was evidence that the parents had continued in and arguably benefited from the services that were provided to them in their previous child's custody case. Id. at ¶ 7. Thus, the appellate court held that, under those particular circumstances, the trial court should have exercised its discretionary powers and should not have applied the mandatory "bypass" exception, because the agency had "failed to provide current, affirmative evidence of the parent's unfitness and inability to care for the child." Id. at ¶ 39. *Page 32 
 {¶ 50} Teresa's case is distinguishable from the cases In re D.A. andIn re Nicholas P. Here, there was evidence that Teresa had failed to continue with and benefit from the services that had been provided to her with her previously three children. (Mar. 17, 2008 Tr. at 11-12). In addition, her parental rights as to her previous three children had been formally terminated on December 19, 2007, only about ten months prior to the removal of Austin. (Feb. 28, 2008 Tr. at 185-189); (Plaintiffs Exs. 4-B, 4-C, 4-D). Moreover, unlike the In re Nicholas P. case, where the agency had failed to demonstrate the current unfitness of the parents, we have already found ACCSB had sufficiently demonstrated that Teresa cannot provide Austin an adequate permanent home because of his medical condition, her limited intellectual functioning, her inability to appreciate known risks to Austin, and her uncooperative demeanor with medical professionals and ACCSB agents.
 {¶ 51} Overall, we find that under the plain language of the statute, the trial court was under a duty to grant ACCSB's motion to "bypass" the reasonable efforts requirement because Teresa had previously had her parental rights involuntarily terminated as provided for in R.C. 2151.419(A)(2)(e). Moreover, we do not find that the facts of Teresa's case should have given rise to the trial court exercising its discretionary power under R.C. 2151.419(A)(3) because, as we have previously stated, there was clear and convincing evidence that ACCSB should be given permanent custody over Austin. *Page 33 
 {¶ 52} Teresa's third assignment of error is, therefore, overruled.
 ASSIGNMENT OF ERROR NO. IV The trial counsel for the mother appellant was ineffective and as such, the mother appellant was denied the fundamental right to counsel.
 {¶ 53} In Teresa's fourth and final assignment of error, she argues that she was denied her right to effective assistance of counsel because of her trial attorney's failure to cross examine the guardian ad litem.
 {¶ 54} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. State v. Kole (2001), 92 Ohio St.3d 303, 306,750 N.E.2d 148, citing Strickland v. Washington (1984), 466 U.S. 668,687, 104 S.Ct. 2052, 80 L.Ed.2d 674. In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. Strickland, 466 U.S. at 687. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. State v. Sallie (1998),81 Ohio St.3d 673, 675, 693 N.E.2d 267. Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. State v. Carter (1995), 72 Ohio St.3d 545, 558, *Page 34 651 N.E.2d 965. Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. SeeState v. Bradley (1989), 42 Ohio St. 3d 136, 141-142, 538 N.E.2d 373, quoting State v. Lytle (1976), 48 Ohio St.2d 391, 396, 358 N.E.2d 623.
 {¶ 55} Teresa's attorney's decision not to cross-examine the guardian ad litem falls within the category of "tactical or strategic trial decision[s]." In re Brooks, 10th Dist. Nos. 04AP-164, 04AP-202, 04AP-165, 04AP-201, 2004-Ohio-3887, ¶¶ 40-41. With that stated, it is well-settled that a court must not scrutinize an attorney's decision to engage or not engage in a particular line of questioning on cross-examination. Id.
 {¶ 56} Teresa's fourth assignment of error is, therefore, overruled.
 D. Conclusion {¶ 57} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment Affirmed.
 WILLAMOWSKI and ROGERS, JJ., concur.
[1] The trial court also found in regards to Austin's father that his identity was unknown and that he had demonstrated a lack of commitment towards Austin by failing to support, visit, or communicate with Austin. (Mar. 17, 2008 JE at 3). Because the father is not a party to this action, we decline to address any of the trial court's findings with respect to Austin's father.
[2] RV is an abbreviation for the term "residual volume," which relates to the volume of air remaining in the lungs at the end of a maximal expiration. Online Medical Dictionary (2007). http://cancerweb.ncl.ac.uk/cgi-bin/omd?Residual+volume. *Page 1