[Cite as *In re R.H.*, 2021-Ohio-458.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re R.H.

Court of Appeals No. L-20-1158

Trial Court No. JC 18272297

**DECISION AND JUDGMENT**

Decided: February 19, 2021

* * * * *

Laurel A. Kendall, for appellant.

Bradley W. King, for appellee.

* * * * *

**ZMUDA, P.J.**

## I. Introduction

{¶ 1} This matter is before the court on appeal of the August 20, 2020 decision of the Lucas County Court of Common Pleas, Juvenile Division, terminating the parental rights and responsibilities of appellant, T.L., the mother of R.H., and granting permanent custody of R.H. to Lucas County Children Services. For the reasons that follow, we affirm.

## II. Facts and Procedural Background

{¶ 2} R.H. was born on November 1, 2018. On December 20, 2018, appellee Lucas County Children Services (LCCS) filed a complaint in dependency and neglect, and the trial court granted temporary custody of R.H. to LCCS. Appellant did not attend the emergency shelter care hearing.

{¶ 3} LCCS offered case plan services to both parents. After receiving an initial assessment, father did not participate with the case services offered. Although appellant did complete an assessment, she failed to sign all necessary releases, and the LCCS caseworker and the guardian ad litem had insufficient access to information. Appellant failed to complete substance abuse services. By her own admission, appellant was unsuccessful in completing her case plan services

{¶ 4} Appellant also had trouble maintaining housing. She did have her own apartment for a period, but was evicted. Appellant lived in a shelter when she gave birth, and lived with her mother after R.H. was born. Additionally, appellant lived with various friends, R.H.'s father, and she claimed to be staying at the YWCA, which was untrue. While appellant lived with R.H.'s father, she was arrested for domestic violence.

{¶ 5} Appellant's visitation with R.H. was inconsistent. She claimed to have issues with transportation, but she also canceled if the weather was too hot, too cold, too wet, or she failed to show up because she forgot about the scheduled visit. When appellant did see R.H., the guardian ad litem expressed concerns with her behavior, noting one occasion in which appellant angrily forced R.H. into too-tight clothing that the

foster parents returned because it was the wrong size, and another in which appellant picked R.H. up by her arm.

{¶ 6} LCCS considered alternatives to permanent custody, but a cousin withdrew herself from consideration and LCCS ultimately determined permanent custody to be in R.H.'s best interest. Prior to having R.H., appellant lost custody of another child. LCCS placed R.H. with foster parents who adopted R.H.'s biological sibling, and the foster parents have expressed a desire to adopt R.H. as well. In March 2020, LCCS filed a motion seeking permanent custody.[1]

{¶ 7} The juvenile court held trial on the motion for termination of parental rights and permanent custody of LCCS on July 30, 2020. Appellant appeared with counsel. Counsel for LCCS appeared, along with LCCS caseworker Kim Casdorph. The guardian ad litem for R.H., Holly Miller, was also present via Zoom. The attorney for R.H.'s father appeared and was granted leave to withdraw, informing the trial court that she had no contact with the father despite attempts to communicate notice of the hearing date.

{¶ 8} Casdorph testified regarding LCCS's efforts to reunite appellant with R.H. Casdorph indicated she received "minimal updates" regarding appellant's progress with her mental health treatment and her drug screens. She also indicated that appellant refused to sign many of the releases necessary to access information on her progress, and

---

[1] LCCS considered filing the motion earlier, but R.H.'s father had appeared in the case and requested time to explore placing R.H. with relatives. Ultimately, no relative came forward and no third party filed a motion seeking placement, prior to trial.

also failed to provide the information herself. Appellant told Casdorph that she did not "trust the system," and feared the information would be used against her. Casdorph did acknowledge that appellant completed the Family Navigator program, a parenting service, through the juvenile court, but did not attend the interactive parenting class requested by LCCS.

{¶ 9} Casdorph also noted appellant's instability in housing. In April 2018, appellant was evicted, and told Casdorph she was living with her mother when R.H. was born. After that, appellant informed Casdorph she was staying "place to place with different people." She lived with R.H.'s father until she was charged with domestic violence after she "allegedly broke the windows out from the apartment." At one point, she told Casdorph she was living at the YWCA, but when Casdorph attempted to see her there, she found out appellant did not reside there. By the time of trial, Casdorph did not know where appellant was living, and she was restricted by LCCS from visiting appellant's home after appellant told others at LCCS that she was going to harm Casdorph.

{¶ 10} As to visitation, Casdorph noted that appellant was at "Level 1" based on her refusal to turn R.H. over to LCCS and attempts to hide at the beginning of the case. Appellant had scheduled visits once a week, but of the 54 visits scheduled appellant had attended only 31, with excuses offered based on the weather or forgetfulness. Casdorph also noted that, during her visits with R.H., appellant would sometimes focus on other people rather than R.H. She also exhibited anger and defiance during visitation, such as

4.

on the occasion after she was seen carrying R.H. across the room by her arm. When cautioned not to carry R.H. that way, appellant responded by saying R.H. was her child and she could do as she chose. At one point, R.H.'s foster parents returned clothing that appellant had purchased in a too-small size, and appellant forced R.H. into the clothing to "prove a point." For R.H.'s birthday, appellant scheduled a special visitation, but never showed up, saying she forgot.

{¶ 11} As to R.H.'s placement, Casdorph indicated that R.H. was with the same foster family that had adopted her biological sibling, and was bonded to her foster family and sibling and doing well. Casdorph observed R.H. in her foster home, and indicated R.H. plays with the children and pets in the household, looks to her foster parents for comfort and direction, "squeals with delight" and hugs her foster father when he comes home, and appears to be thriving in the stable environment provided by her foster family. As to alternative placement with relatives, Casdorph testified that LCCS considered appellant's cousin, but halted the home study process at the cousin's request. Other individuals put forth by appellant later in the process were not considered, based on a lack of a biological relationship with appellant and lack of relationship with R.H.

{¶ 12} Appellant presented testimony of her relative by marriage, O.G., in addition to her own testimony. O.G. was related through the marriage of her cousin to appellant's grandparent, and had known appellant since birth. Although O.G. had not filed a third-party motion for custody, she expressed a desire to have custody of R.H. at trial, and began the process for a background check months prior to trial, with the next

5.

steps not yet completed by LCCS. O.G. acknowledged appellant's "melt-downs" and testified she counseled appellant to "reroute her and do something positive with herself" and not give up. O.G. encouraged appellant to go to a shelter for women that could provide services, but appellant did not follow that advice. O.G. also tried to help appellant with her mental health and potential substance abuse issues, but noted that treatment "can only help you if you want to help yourself." O.G. acknowledged that appellant refused to provide information to LCCS regarding her progress with services.

{¶ 13} Appellant testified regarding her reasons for withholding releases and missing visitation. As to her treatment and the releases, appellant indicated she received a mental health diagnosis of depression and anxiety, and took prescribed medication. She shared initial information with Casdorph before deciding it was enough and refused to sign any additional releases. Appellant testified that she did her part, but LCCS did not provide information or updates regarding R.H., justifying her refusal to provide more of her own information. Appellant also attempted to explain her missed visitation, indicating she did not wish R.H. to travel when the weather was too hot, too cold, or too rainy, or she did not show up because she felt ill. Appellant also appeared to hold LCCS responsible because she felt the agency did not provide her enough help with transportation, while also noting she had transportation for work during the periods she held a job.

{¶ 14} Miller, the guardian ad litem for R.H., also testified. Miller had been involved in the case from the beginning, and maintained contact with appellant as much

6.

as possible. She was present for visits by appellant with R.H., and observed appellant's anger and her conduct with R.H. She also continued to request updated releases from appellant, with the last release requested in the months before trial. Miller testified that appellant refused, saying Miller "had all the information that [she] needed." Based on the lack of information, Miller had no knowledge of appellant's completion of case plan services, and expressed concern with appellant's "follow through with her services, her inconsistent visits, anger management and parenting." As to R.H.'s best interests, Miller testified that R.H. "is very bonded with her sibling and doing well in the [foster] home."

{¶ 15} After considering the testimony and evidence, including the prior termination case relative to R.H.'s sibling, the juvenile court terminated appellant's parental rights and found permanent placement with LCCS was in the best interests of R.H. Appellant filed a timely appeal of this judgment.

### III. Assignments of Error

{¶ 16} Appellant raises a single assignment of error in challenging the judgment:

LCCS did not prove by clear and convincing evidence that

termination of mother's parental rights were in the child's best interest

when legal custody could have been considered to a maternal relative who

had expressed interest in custody and testified at trial.

### IV. Analysis

{¶ 17} Appellant challenges the award of permanent custody to LCCS, arguing a lack of clear and convincing evidence that termination of parental rights would be in

7.

R.H.'s best interest, considering an available maternal relative to assume custody. We note, however, that there was no third-party motion filed with the juvenile court, seeking custody of R.H. as an alternative to foster care.

{¶ 18} We review a juvenile court's decision regarding termination of parental rights based on the manifest weight of the evidence, and will not reverse unless we find a lack of competent and credible evidence demonstrating the essential statutory elements for termination of parental rights. *In re Alyssa C.*, 153 Ohio App.3d 10, 2003-Ohio-2673, 790 N.E.2d 803, ¶ 13 (6th Dist.), citing *In re Forrest S.*, 102 Ohio App.3d 338, 345, 657 N.E.2d 307 (6th Dist.1995); *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 19} A motion for permanent custody is governed by R.C. 2151.414, which "sets forth the procedures a juvenile court must follow and the findings it must make before granting a motion filed pursuant to R.C. 2151.413." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 22, quoting *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 9. A juvenile court must find, by clear and convincing evidence, that terminating parental rights and awarding permanent custody to a children services agency satisfies both portions of the permanent custody test set forth in R.C. 2151.414. *In re Katrina T.*, 6th Dist. Sandusky No. S-03-024, 2004-Ohio-3164, ¶ 13. Clear and convincing evidence is defined as "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will

8.

produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross* at paragraph three of the syllabus.

{¶ 20} The two-part test of R.C. 2151.414 requires the juvenile court to find (1) that child cannot be placed with either parent within a reasonable time, or the child is abandoned, orphaned, or has been in temporary custody of the agency for at least 12 months of a consecutive 22-month period as provided by R.C. 2151.414(B), and (2) that the grant of permanent custody to the agency is in the best interest of the child, applying the factors under R.C. 2151.414(D). *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 33-36, 56.

{¶ 21} Here, the juvenile court first determined that R.C. 2151.414(B)(1)(a) was satisfied, finding R.H. could not and should not be placed with either parent within a reasonable time based on consideration of R.C. 2151.414(E)(1), (2), (4), and (11). These provisions are as follows:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental

9.

utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

\* \* \*

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

\* \* \*

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to

those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

{¶ 22} The trial court specifically found that appellant failed to complete her case plan, failed to maintain stable housing, and failed to take advantage of her visitation time, with her behavior when she did have visitation "often inappropriate." Appellant acknowledged her failure to complete case plan services, and refused to provide LCCS with information regarding her housing. While she disputed issues related to visitation, she acknowledged missing numerous visits and did not effectively refute LCCS's concerns regarding her behavior during visitation.

{¶ 23} The juvenile court further found that appellant has significant mental health concerns and failed to fully participate with treatment in order to provide an adequate home for R.H. Appellant acknowledged her diagnoses. She also admitted her refusal to provide releases to LCCS, and as a result, the record contained no information demonstrating any progress in her treatment.

{¶ 24} The juvenile court determined that appellant also demonstrated a lack of commitment to R.H. by failing to support, visit, or communicate with R.H. when able to do so, noting the infrequency of appellant's visitation and numerous excuses for this failure. Again, appellant acknowledged her infrequent visitation, and while she had many excuses, there was little justification for appellant's failure to miss so many visits.

11.

The juvenile court had ample evidence to find a lack of commitment on the part of appellant.

{¶ 25} Additionally, the juvenile court noted that appellant had parental rights terminated in a prior case for R.H.'s sibling, shifting the burden to appellant to demonstrate by clear and convincing evidence, that appellant could provide adequate care for R.H. and a secure placement, notwithstanding the prior termination of parental rights. Appellant did not dispute her parental rights were terminated as to R.H.'s sibling. Furthermore, appellant refused to provide much information regarding her housing or her participation in case services, and consequently, appellant failed to carry her burden as to this factor.

{¶ 26} In satisfying the second part of the two-part test, the juvenile court next weighed the factors of R.C. 2151.414(D), and found by clear and convincing evidence that an award of permanent custody to LCCS was in the best interest of R.H. The juvenile court expressly noted application of R.C. 2151.414(D)(1)(a), (c), and (d), which provide:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> * * *
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services

agencies or private child placing agencies for twelve or more months of a

consecutive twenty-two-month period, or the child has been in the

temporary custody of one or more public children services agencies or

private child placing agencies for twelve or more months of a consecutive

twenty-two-month period and, as described in division (D)(1) of section

2151.413 of the Revised Code, the child was previously in the temporary

custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and

whether that type of placement can be achieved without a grant of

permanent custody to the agency;

{¶ 27} As to these factors, the juvenile court noted that R.H. "has the benefit of being placed with her biological sister" and "she is extremely bonded to her sibling and to her foster family." Also noted was the custodial history, and the fact that R.H. had been in the temporary custody of LCCS for 17 months, beginning February 5, 2019. The juvenile court concluded that R.H.'s need for permanent custody required an award of permanent custody to LCCS.

{¶ 28} Appellant does not dispute the evidence supporting the juvenile court's decision, but instead pursues policy argument relative to the refusal by LCCS to consider O.G. for alternative placement. Appellant argues that LCCS rejected O.G. as a non-relative, limiting its consideration of family to "the direct, nuclear or more 'blood' definition of family," contrary to the recognized and protected interest of a parent in the

"care, custody and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

{¶ 29} The foster family had custody of R.H. for much of her life. Also, throughout R.H.'s placement with her foster family, LCCS continued to attempt to work with appellant to achieve reunification, and O.G. did not begin the process to apply for custody of R.H. until three or four months before the trial date. Significantly, O.G. never filed a third-party complaint, seeking custody, and the juvenile court therefore never had that claim before it for consideration.

{¶ 30} We recently considered the rights of parents to place their child with a family member who was not related by blood in *In re A.K.*, 6th Dist. Ottawa No. OT-20-001, 2020-Ohio-4700. In that case, father was incarcerated and only mother attempted to complete case plan services to reunite with the child. *In re A.K.* at ¶ 9. A.K. was placed in the care of the Ottawa County Department of Job and Family Services shortly after her birth after drugs were found in her system. *Id.* at ¶ 3-4.

{¶ 31} The parents initially asked the agency to place A.K. with a family friend, considered to be like family, but the agency rejected this friend as an option, noting the friend's own history with the agency relative to her own children. *Id.* at ¶ 5. Father's sister also expressed an interest in caring for A.K., but both parents strongly objected to the sister having custody of the child. *Id.* A.K. remained with her foster family while mother completed some her case plan objectives and began visitations with A.K. *Id.* at

14.

¶ 6, 9. However, after several months, mother died unexpectedly. With reunification no longer possible, the agency sought permanent custody.

{¶ 32} At trial, the juvenile court considered the motion for permanent custody, as well as third-party claims for custody filed by the family friend and father's sister, late in the case. We affirmed the juvenile court's judgment awarding custody to the agency as in the best interest of the child, based in part on the bond formed between A.K. and her foster family while mother worked toward reunification, and the foster family's intention to adopt A.K. *Id.* at ¶ 57-58. In affirming, we noted that "[a] parent's rights * * * 'are always subject to the ultimate welfare of the child.'" *Id.* at ¶ 23, quoting *In re Nicholas P.*, 169 Ohio App.3d 570, 2006-Ohio-6213, 863 N.E.2d 1102, ¶ 17 (6th Dist.), citing *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 33} In the present case, LCCS offered appellant case plan services with the goal of reunification, but appellant either did not complete her services or refused to provide information regarding her progress. Furthermore, while O.G. expressed an interest in taking care of R.H., she did not appear until late in the proceedings and never filed a third-party complaint seeking custody. Therefore, R.H. never bonded with O.G., and in fact, never had any contact with O.G. Whether O.G. was considered a family member, therefore, was not the issue, as the juvenile court was required to consider the best interests of R.H., even over the wishes of appellant as R.H.'s mother.

15.

**{¶ 34}** Upon due consideration of the record, we find the juvenile court's judgment, awarding permanent custody to LCCS, was supported by clear and convincing evidence. Accordingly, appellant's sole assignment of error is not well-taken.

### III. Conclusion

**{¶ 35}** Having found that the juvenile court committed no error prejudicial to appellant, and that substantial justice has been done, we affirm the judgment of the Lucas County Court of Common Pleas, Juvenile Division. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J. _____

_____
JUDGE

Christine E. Mayle, J. _____

_____

Gene A. Zmuda, P.J. _____
CONCUR.
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.