[Cite as *In re B.J.*, 2022-Ohio-3307.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF: | : | |
| B.J. AND W.J., | : | CASE NO. 22CA3991 |
| Adjudicated Neglected/ | : | |
| | | Dependent Children. |
| | | DECISION & JUDGMENT ENTRY |
| | : | |

APPEARANCES:

George L. Davis, IV, Portsmouth, Ohio, for Appellant.

Shane A. Tieman, Scioto County Prosecuting Attorney, Jay S. Willis, Assistant Scioto County Prosecuting Attorney, Portsmouth, Ohio, for Appellee.

_____
CIVIL CASE FROM COMMON PLEAS COURT, JUVENILE DIVISION
DATE JOURNALIZED:9-14-22
ABELE, J.

{¶1} This is an appeal from a Scioto County Common Pleas Court, Juvenile Division, judgment that granted Scioto County Children Services Board, appellee herein, temporary custody of one-year-old B.J. and three-year-old W.J.

**{¶2}** The children's biological parents, appellants herein, raise the following assignment of error for review:

"THE TRIAL COURT PREJUDICIALLY ERRED BY ADJUDICATING THE MINOR CHILDREN NEGLECTED AND/OR DEPENDENT."

**{¶3}** On November 16, 2021, appellee filed a complaint that alleged three-year-old W.J. and ten-month-old B.J. are "neglected/dependent children" under R.C. 2151.03(A)(2) and R.C. 2151.04(C). Appellee also requested an ex parte order placing the children in its temporary custody. To support its complaint, appellee submitted caseworker Miranda Howard's affidavit. Howard averred that on November 15, 2021, the agency received a referral that involved B.J. The referral indicated that mother brought B.J. to the emergency room, but she then "took him and fled into the woods." Hospital security personnel located the mother and returned her and the child to the emergency room.

**{¶4}** Caseworker Howard later visited the hospital and attempted to speak with mother, but she refused to provide much information. The mother stated that she and the children's father had argued in a cabin at Shawnee State Park and, as a result of this argument, she took B.J. and walked away. The mother found a ride to the emergency room but fled the hospital when she "became scared because 'people with masks were making noises at her and she does not want in the politics.'" Howard

further explained that mother became combative --- mother tried to fight a nurse and bit a security officer. Medical personnel restrained the mother and drew blood for an alcohol concentration test. The test revealed a .225 BAC.

{¶5} Later, sheriff deputies located father and W.J. and brought them to the hospital. The father stated that the family's vehicle had broken down and he attempted to take B.J. from mother. The father claimed that mother told the father "not to touch her or the child because she did not trust him." The father started to walk to the cabin and thought mother followed him. When he returned to the cabin, he placed W.J. in bed.

{¶6} Based upon the foregoing allegations, the trial court awarded appellee temporary emergency custody of the children. At a probable-cause hearing, the court continued the children in appellee's temporary custody.

{¶7} At the January 24, 2022 adjudication hearing, Joyce Ann Nixon testified that, late in the evening of November 15, 2022 she was driving to West Union and noticed a person (mother) standing in the opposite lane of travel. When mother waved her arms and yelled for help, Nixon stopped and asked what she needed. The mother told Nixon that she was lost. Nixon noted

that mother carried a baby and, because of the cold temperature, Nixon told the mother to enter the vehicle.

{¶8} When the mother entered Nixon's vehicle, she said she needed to make a phone call. Nixon, however, informed mother that the area did not have cell phone service and mother would need to go to "CCC Camp" to make a call.

{¶9} As Nixon drove, she noticed that mother smelled of alcohol. The mother also informed Nixon that the baby was ill. Nixon eventually decided to take the mother and baby to the hospital.

{¶10} When they arrived at a stop sign near the hospital, the mother "jumped up and took off running with the baby and had the baby by the arm * * * like you would carry a doll." Nixon called security and told the officers that the mother needed help.

{¶11} Southern Ohio Medical Center (SOMC) Security Officer Wendell Sorrell stated that he located mother and baby after mother departed the hospital and when law enforcement officers looked for her. Sorrell found her lying on the ground with the child in her arms. He kept watch over the mother until other hospital personnel convinced the mother to return to the

hospital.

**{¶12}** Officer Sorrell indicated that the mother seemed argumentative with hospital staff, that she slurred her words, and he believed she was either drug or alcohol impaired. Sorrell also thought that mother did not hold the baby in a careful manner and he "kept waiting for her to drop the child." Sorrell further explained that he helped restrain the mother so medical staff could draw blood. He further stated that while he restrained the mother's arm, she bit him.

**{¶13}** SOMC Security Officer Jeff Duduit testified that while in a hospital room with mother and baby, he "was greatly concerned that [the mother] was going to drop the infant because she wasn't supporting the head and was holding it [in] a dangerous manner." Duduit also detected an odor of alcohol and he remained concerned throughout his encounter that mother would drop the baby. A doctor eventually ordered security officers to remove the baby from the mother.

**{¶14}** Officer Duduit also explained that, when medical personnel tried to ask mother a question, she would not answer and instead "talk[ed] about things that weren't related to" the reason for her and the child's presence at the hospital.

**{¶15}** Portsmouth City Police Officer Timothy Penley stated

that he responded to the hospital around 10:30 p.m. on November 15, 2021. Penley explained that he spoke with father when he arrived at the hospital. Penley reported that father informed him that when the family's vehicle had broken down, they started to walk to their destination.

{¶16} The father further advised Officer Penley that he thought mother and baby followed him, but later learned they did not. The father stated that he continued to walk with W.J. and returned to their Shawnee Park cabin. He informed Penley that mother had been drinking a little, but he was not concerned about her condition.

{¶17} Portsmouth City Police Patrolman John Dixon stated that he arrived at the hospital around the same time as Officer Penley. When Patrolman Dixon spoke with mother, he noted that the mother appeared to be intoxicated and he had concerns that baby would fall from her arms.

{¶18} The mother informed Patrolman Dixon that the family had gone to Shawnee Lodge to order food, but that the parents had been arguing and their vehicle would not start. The mother told Patrolman Dixon that the father and W.J. walked in one direction and mother and baby walked in the other direction. The mother advised Patrolman Dixon that she later flagged down Joyce

Nixon's vehicle and Nixon drove mother to the hospital.

{¶19} Appellee also presented testimony from other hospital personnel and all related concern for the child's well-being due to mother's behaviors.

{¶20} Scioto County Children Services Caseworker Emma Coldiron testified that she visited the hospital in response to a referral the agency had received. Coldiron stated that she heard father explain that he and mother had argued after their vehicle became disabled and father tried to take the baby but mother resisted. The father indicated that he and W.J. started to walk toward their cabin and he thought that mother followed him.

{¶21} The father explained that, when he arrived at the cabin and realized that mother did not follow him, he placed W.J. in bed and remained in the cabin. The father did not suggest that he made any effort to locate the mother and the baby. He related that although he had no access to a phone or a vehicle, he had no concern and "figured [the mother had] found somewhere to go." The father did acknowledge that mother had approximately four drinks during dinner. He did not believe, however, that she was intoxicated at the time of their argument.

{¶22} The trial court asked Caseworker Coldiron to explain

her reasoning for deciding to take emergency custody of the children rather than letting the father take them home, and she stated that the mother "was highly intoxicated," "her behavior was erratic," and "she had taken off with her child [who was] under the age of one." Coldiron further indicated that mother "had [a] history with alcoholism and had several other children removed from her care."

**{¶23}** After appellants' counsel objected to Caseworker Coldiron's statement regarding the mother's history, the trial court asked Coldiron to explain how she knew about mother's history of alcoholism and that she had other children removed from her care. Coldiron stated that she searched "SACWIS," a state database that contains information about child welfare,[1] and discovered that mother had an alcohol problem and had "several" other children removed from her care. The search results also indicated that the mother had been "uncooperative with several other agencies."

**{¶24}** Caseworker Coldiron did clarify that the children removed from mother's care had a different biological father than the father involved in the case at bar. She stated,

---

[1] The acronym, "SACWIS," stands for Statewide Automated Child Welfare Information System.

however, that she "had concerns that [the father] had not attempted in any way to locate" the mother and the baby. Coldiron further relayed the following additional concerns: (1) father did not realize mother and baby had not followed him to the cabin; (2) father did not discover them missing until he returned to the cabin; (3) father did not recognize mother's serious intoxication; (4) father also appeared to minimize mother's level of intoxication displayed during her hospital encounter; and (5) when father arrived at the hospital at 4:00 a.m., "he did not appear to be concerned that she was intoxicated with his child." After Coldiron's testimony, appellee finished presenting its case.

**{¶25}** Appellants called Scioto County Sheriff's Deputy Brian Nolan to testify. Nolan explained that he had been assigned the task of locating the father. Nolan stated that when he learned that the family had been staying at cabins at Shawnee Lodge, he visited the lodge to ask which cabin had been registered to the family. He discovered, however, that the family had not registered to stay in one of the cabins.

**{¶26}** Deputy Nolan related that he started to drive around the area where cabins are located to attempt to find the cabin where the family had been staying. Nolan indicated that around

1:30 a.m. or 2:00 a.m., he noticed a baby stroller outside a cabin and no vehicle nearby. The deputy thus decided to knock on the door to determine if the father and W.J. were inside.

{¶27} Deputy Nolan reported that, after he knocked on the door, the father responded and opened the door. Nolan did not observe any sign of impairment or inebriation, but instead described father as "[n]ormal." Nolan indicated that he also checked on W.J. and found her asleep in bed. The deputy looked around the cabin and found it to be "normal" with "[n]othing out of the ordinary."

{¶28} On cross-examination, Deputy Nolan stated that the walk from the family's disabled vehicle to the cabin would have taken at least 20 to 30 minutes. When appellee's attorney asked the deputy whether the father noticed at any point during his walk that mother and the baby did not follow him, Nolan responded that father informed the deputy that the father thought "she would show up but she never did."

{¶29} The father testified and explained that, on the evening of November 15, 2021, the family had dinner at the lodge and after dinner, they left in their vehicle to return to their cabin. The father related that as they drove down the hill away from the lodge, their truck stopped. He explained that he put

the vehicle in neutral and coasted to the bottom of the hill where he parked (in?) a lot and tried to restart the vehicle. He could not restart the vehicle, however.

{¶30} The father advised the court that, at that point, he and mother had two choices: "sit in the middle of an empty parking lot all night or go back to the cabin on foot." He indicated that they decided to walk back to the cabin. The father reported that he started to walk toward the cabin while carrying W.J. and he thought the mother followed him. He noticed that she may not be "right behind" him, but he thought she would return to the cabin. He asked himself, "where else was she going to go besides back to our cabin?"

{¶31} The father explained that after he returned to the cabin, he placed W.J. in bed and waited for mother and baby to arrive. When they did not arrive, father explained he "didn't know what else to do." He thought that by the morning, "somebody would be making rounds that could [give him] a ride" so he could go to the family's residence to obtain their other vehicle.

{¶32} The father indicated that when Deputy Nolan arrived, the father is "pretty sure" that he asked Nolan for a ride to the hospital. The father further reflected, however, and

thought that if the deputy drove him to the hospital, the family would be stranded at the hospital. The father stated that he thus asked the deputy to drive him to the residence where the family's other car was located.

{¶33} When the father arrived at the hospital, the caseworker "wanted to know why [the father] didn't have any concern for [his] children." The father reported that he "tried to explain at the time that [he] had absolutely no way to go anywhere," "no way to leave," and "no way to contact anybody." He stated: "If my kids' lives depended on it, I couldn't have been there." The father additionally revealed that he became upset to learn that he would not be able to take the children home. He testified that the family has a home and that he and mother meet all of the children's basic needs. He further explained that neither of the children had injuries and both appeared to be fine.

{¶34} On cross-examination, the father stated that he and the children's mother have been married for about two-and-one-half years. He is employed, works from 5:00 a.m. to 3:30 p.m. during the week, and mother stays home to care for the children. Although the father agreed that he knew that previously mother had children removed from her care and that she had issues with

alcohol abuse, he does not believe that mother has an ongoing alcohol abuse issue.

**{¶35}** When appellee's counsel asked the father about the events that occurred on November 15, 2021, the father stated that he did not believe that the mother appeared "unsteady on her feet" and did not slur her words, and he did not consider her to be "unsafe" or "impaired." The father related that if he had believed that mother was "unsafe" or "impaired, he "wouldn't have let her take the baby." The father did agree, however, that the temperature that night hovered around 40 degrees Fahrenheit and that he thus tried to walk quickly.

**{¶36}** The trial court asked the father whether he had a flashlight in the vehicle that he could have used to help illuminate the walk to the cabin. The father stated that he normally keeps one in his console, but did not find it on the night in question. The court asked whether he and mother had cell phones, and he stated that they did not. The father also agreed that he did not look behind to ensure that the mother and the baby followed him and that he regrets that decision. He explained that he had "assumed that she was following me."

**{¶37}** The father believes that it took him approximately 20 minutes to walk to the cabin. He stated that none of the family

members had been wearing a jacket because they did not plan to be outside for any significant length of time. The father also agreed with the court that the family could have walked to the lodge and ask for help, but he explained that the walk is steep and it would have been challenging. He thought that walking to the cabin would be easier.

**{¶38}** On March 8, 2022, the trial court adjudicated the children "negl[ected]/dependent" because the parents failed to provide proper care for the children. After their car broke down while driving away from Shawnee Lodge, the parents chose to walk along a dark, curvy road on a cold night while the mother was extremely intoxicated. The court determined that the parents should have known that, given the remote location, cell phone service would have been unavailable. The court additionally pointed out that the parents could have walked to the lodge, which had working telephones along with individuals who could provide any needed help. The court further found that the mother handled the baby in a dangerous and careless manner. The court thus concluded that "the children were endangered by their parents by their choices" and

> the children are negligent/dependent [sic] as alleged in the complaint because the children lacked adequate parental care because of the fault of the child's parents; because the parents neglected to provide proper

care necessary for the children's well-being; because the parents' omissions threatened to harm the children; because the children lacked adequate parental care because of the intoxication of their mother and the poor choices made by her and the father; because the environment was such as to warrant the State, in the interest of the child, to assume the child's guardianship.

The court subsequently entered a dispositional order that placed the children in appellee's temporary custody. This appeal followed.

{¶39} In their sole assignment of error, appellants assert that the trial court erred by adjudicating the children neglected and/or dependent. In particular, they contend that appellee failed to present clear and convincing evidence to show that the children are neglected or dependent. Appellants claim that the court based its decision upon "one bad night" and that the court failed to consider appellants' overall care of the children. Appellants assert that neither child suffered harm and they received proper care. They further note that appellee failed to present any evidence regarding the conditions of the family's home and that appellee relied solely upon the conduct that occurred during "a weekend family outing."

A

{¶40} Generally, a reviewing court will not disturb a trial court's abuse, neglect, or dependency adjudication unless the

SCIOTO, 22CA3991

decision is against the manifest weight of the evidence. *In re W.M.*, 6th Dist. Lucas No. {48}L-22-1016, 2022-Ohio-1978, ¶ 38; *In re M.H.*, 9th Dist. Wayne No. 09CA0028, 2009-Ohio-6911, ¶ 14; *see In re B.E.*, 4th Dist. Highland No. 13CA26, 2014-Ohio-3178, ¶ 27 (applying manifest-weight-of-the-evidence standard in the permanent-custody context).

> "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'"

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary 1594 (6th Ed.1990).

**{¶41}** When an appellate court reviews whether a trial court's decision is against the manifest weight of the evidence, the court

> "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'"

*Eastley* at ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001), quoting *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); *accord In re Pittman*, 9th Dist. Summit No. 20894, 2002-Ohio-2208, ¶¶ 23-24. We further observe, however, that issues that relate to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained in *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984):

> The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.

**{¶42}** Moreover, deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well (Emphasis sic)." *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997); *accord In re Christian*, 4th Dist. No. 04CA10, 2004-Ohio-3146, ¶ 7.

**{¶43}** The question that an appellate court must resolve when reviewing an abuse, neglect, or dependency adjudication under

the manifest-weight-of-the-evidence standard is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 43; *accord* R.C. 2151.35(A)(1) (at an adjudicatory hearing court must determine, by clear and convincing evidence, whether child is abused, neglected, or dependent). "Clear and convincing evidence" is:

> the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.

*In re Estate of Haynes*, 25 Ohio St.3d 101, 103-04, 495 N.E.2d 23 (1986). In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990); *accord In re Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), citing *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954) ("Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact

had sufficient evidence before it to satisfy this burden of proof."); *In re Adoption of Lay*, 25 Ohio St.3d 41, 42-43, 495 N.E.2d 9 (1986). *Cf. In re Adoption of Masa*, 23 Ohio St.3d 163, 165, 492 N.E.2d 140 (1986) (whether a fact has been "proven by clear and convincing evidence in a particular case is a determination for the [trial] court and will not be disturbed on appeal unless such determination is against the manifest weight of the evidence").

{¶44} Thus, if a children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that the child at issue is abused, neglected, or dependent, the court's decision is not against the manifest weight of the evidence. *In re B.S.*, 6th Dist. Erie No. E-19-052, 2020-Ohio-6775, ¶ 62 (applying manifest-weight-of-the-evidence standard in abuse, neglect, and dependency context); *see In re R.M.*, 2013-Ohio-3588, 997 N.E.2d 169, ¶ 62 (4th Dist.) (discussing manifest-weight-of-the-evidence standard in the permanent-custody context).

{¶45} Once a reviewing court finishes its examination, the judgment may be reversed only if it appears that the factfinder, when resolving the conflicts in evidence, "'clearly lost its way

and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).  A reviewing court should find a trial court's abuse, neglect, or dependency decision against the manifest weight of the evidence only in the "'exceptional case in which the evidence weighs heavily against the [decision].'"  *Id.*, quoting *Martin*, 20 Ohio App.3d at 175; *accord State v. Lindsey*, 87 Ohio St.3d 479, 483, 721 N.E.2d 995 (2000).

B

**{¶46}** We recognize that "parents' interest in the care, custody, and control of their children 'is perhaps the oldest of the fundamental liberty interests recognized by th[e United States Supreme] Court.'"  *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 19, quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).  Indeed, the right to raise one's "child is an 'essential' and 'basic' civil right."  *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990); *accord In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997); *see Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ("natural parents have a fundamental

right to the care and custody of their children"). Thus, "parents who are 'suitable' have a 'paramount' right to the custody of their children." *B.C.* at ¶ 19, quoting *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977), citing *Clark v. Bayer*, 32 Ohio St. 299, 310 (1877); *Murray*, 52 Ohio St.3d at 157.

{¶47} A parent's rights, however, are not absolute. *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 11. "The constitutional right to raise one's children does not include a right to abuse, exploit, or neglect them, nor is there a right to permit others to do so." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 40. Consequently, "'the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla. App. 1974). Thus, the State may intervene when a child's best interest demands intervention. *D.A.* at ¶ 11; *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28, citing R.C. 2151.01 ("government has broad authority to intervene to protect children from abuse and neglect"). *See generally In re Z.R.*, 144 Ohio St.3d 380, 2015-

SCIOTO, 22CA3991

Ohio-3306, 44 N.E.3d 239, ¶ 20, quoting *In re T.R.*, 52 Ohio

St.3d at 15, 556 N.E.2d 439 (noting that "'[t]he mission of the

juvenile court is to act as an insurer of the welfare of

children and a provider of social and rehabilitative

services'").

{¶48} To that end, R.C. 2151.27(A)(1) and (C) authorize a

children services agency to file a complaint requesting

temporary or permanent custody of a child alleged to be abused,

neglected, or dependent.  After an abuse, neglect, or dependency

complaint is filed, R.C. 2151.28(A) requires the court to

schedule an adjudicatory hearing.  At an adjudicatory hearing,

if a court determines, by clear and convincing evidence, that a

child is abused, neglected, or dependent, the court then must

schedule a dispositional hearing and order a disposition

authorized under R.C. 2151.353(A).[2]  If, however, the court

---

[2] R.C. 2151.353(A) permits trial courts to enter the following
dispositional orders for adjudicated abused, neglected, or
dependent children:

  (1) Place the child in protective supervision;
  (2) Commit the child to the temporary custody of
 any of the following:
  (a) A public children services agency;
  (b) A private child placing agency;
  (c) Either parent;
  (d) A relative residing within or outside the
 state;

concludes that the allegations in the complaint have not been established by clear and convincing evidence, the court must dismiss the complaint.  R.C. 2151.35(A)(1); Juv.R. 29(F)(1).

{¶49} In the case sub judice, the trial court determined

---

(e) A probation officer for placement in a certified foster home;

(f) Any other person approved by the court.

(3) Award legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings. * * *

* * * *

(4) Commit the child to the permanent custody of a public children services agency or private child placing agency, if the court determines in accordance with division (E) of section 2151.414 of the Revised Code that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D)(1) of section 2151.414 of the Revised Code that the permanent commitment is in the best interest of the child. * * * *

(5) Place the child in a planned permanent living arrangement with a public children services agency or private child placing agency * * *

* * * *

(6) Order the removal from the child's home until further order of the court of the person who committed abuse as described in section 2151.031 of the Revised Code against the child, who caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, or who is the parent, guardian, or custodian of a child who is adjudicated a dependent child and order any person not to have contact with the child or the child's siblings.

that the children are "negl[ected]/dependent" and placed them in appellee's temporary custody.  Appellants contend that the trial court's neglected and/or dependency finding is against the manifest weight of the evidence.

{¶50} For ease of discussion, we first consider appellants' assertion that the trial court's dependency adjudication is against the manifest weight of the evidence.[3]

C

{¶51} R.C. 2151.04(C) defines a dependent child as "any child * * * [w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship."  A dependency inquiry under R.C. 2151.04(C) "focuses exclusively on the child's situation to determine whether the child is without proper (or adequate) care or support."  *In re Riddle*, 79 Ohio St.3d 259, 262, 680 N.E.2d 1227, 1230 (1997).  Thus, parental "faults or habits" are not at

---

[3] As we explain *infra*, the trial court needed to find that the children are neglected or dependent, not that the children are neglected and dependent.  *See* R.C. 2151.35(A) (emphasis added) (if court finds child is "an abused, neglected, *or* dependent child," the court may proceed to disposition); *In re Riddle*, 79 Ohio St.3d 259, 262, 680 N.E.2d 1227 (1997) ("recogniz[ing] a distinction between" a dependency allegation and a neglect allegation).

issue in a dependency case. *Id.* at 263. A court may, however consider a parent's conduct if the conduct adversely affects the child's condition or environment. *In re Burrell*, 58 Ohio St.2d 37, 39, 388 N.E.2d 738 (1979) (parental "conduct is only significant if it can be demonstrated to have an adverse impact upon the child sufficiently to warrant state intervention"); *accord In re D.W.*, 4th Dist. Athens No. 06CA42, 2007-Ohio-2552, ¶ 20.

**{¶52}** Furthermore, a trial court need not find that a child has suffered "actual harm" in order to adjudicate a child dependent. *In re Y.R.*, 12th Dist. Warren No. CA2020-09-057, 2021-Ohio-1858, ¶ 60. Instead, circumstances that suggest a child's condition or environment poses "a legitimate risk of harm may suffice to support a dependency adjudication under R.C. 2151.04(C)." *In re S Children*, 1st Dist. Hamilton No. C-170624, 2018-Ohio-2961, ¶ 36, citing *In re M.E.G.*, 10th Dist. Franklin Nos. 06AP-1256, 06AP-1257, 06AP-1258, 06AP-1259, 06AP-1263, 06AP-1264 and 06AP-1265, 2007-Ohio-4308, ¶ 62 (upholding dependency adjudication when father sexually abused sibling); *accord Burrell*, 58 Ohio St.2d at 39 (state failed to present sufficient evidence that parental conduct had "a present or potential detrimental impact"); *In re K.R.*, 9th Dist. Summit No.

29815, 2021-Ohio-495, ¶ 29 and 36 (evidence supported dependency adjudication when sibling died under suspicious circumstances, even though no safety hazards observed in the home and adjudicated dependent child "was not malnourished, was of the appropriate weight and height for his age, had no bruises, and did not exhibit any physical or mental health issues"); *In re C.T.*, 6th Dist. Sandusky No. S-18-005, 2018-Ohio-3823, ¶ 61 (evidence supported dependency finding when mother's drug use, failure to address substance abuse, and overdose created an environment inappropriate for child.).  Additionally, "simply because a child's physical needs are being met and a home is clean does not preclude a juvenile court from finding a child dependent."  *In re Y.R.*, 12th Dist. Warren No. CA2020-09-057, 2021-Ohio-1858, ¶ 59, citing *In re L.H.*, 12th Dist. Warren Nos. CA2018-09-106, and CA2018-09-109, CA2018-09-110, CA2018-09-111, 2019-Ohio-2383, ¶ 47 (affirming dependency finding when agency had no concerns with home condition and cleanliness, but children exposed to marijuana use in the home).

{¶53} We further note that courts must "liberally" interpret and construe R.C. 2151.04(C) to comport with the overall purpose of R.C. Chapter 2151:

> To provide for the care, protection, and mental and physical development of children subject to Chapter

SCIOTO, 22CA3991

> 2151. of the Revised Code, whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety[.]

R.C. 2151.01(A); *accord In re M.W.*, 12th Dist. Warren No. CA2020-03-018, 2021-Ohio-1129, ¶ 13, citing *L.H.* at ¶ 41 ("R.C. 2151.04(C) is to be applied broadly to protect a child's health, safety, and welfare.").

**{¶54}** In the case before us, after our review we do not believe that the trial court's dependency adjudication is against the manifest weight of the evidence.[4] Instead, we believe that the record contains ample clear and convincing evidence to support the trial court's finding that the children's "condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship." R.C. 2151.04(C). In particular, appellee

---

[4] R.C. 2151.28(L) requires trial courts that find a child to be a dependent child to

> incorporate that determination into written findings of fact and conclusions of law and enter those findings of fact and conclusions of law in the record of the case. The court shall include in those findings of fact and conclusions of law specific findings as to the existence of any danger to the child and any underlying family problems that are the basis for the court's determination that the child is a dependent child.

SCIOTO, 22CA3991

presented evidence that in mid-November 2021, the parents took their young children to stay (as unregistered guests) at a Shawnee State Park cabin, then the family left the cabin, without wearing any jackets or having cell phones, and drove to dinner at Shawnee Lodge.  The mother apparently consumed alcoholic beverages during dinner and, after dinner, the family returned to their vehicle and began to return to their cabin. Along the way, the vehicle stopped, the father parked the vehicle, and the parents decided they would not walk to the lodge where they could ask for assistance, but instead decided to walk to their cabin with their two young children, even though no one had an appropriate coat or other covering for walking about one mile on a chilly November evening.  Moreover, the parents made this decision with the knowledge that they did not have cell phones or any way to illuminate their walk along the dark roadway.  Additionally, the father did not ensure that the mother and the baby followed him to the cabin.  Instead, the mother walked a different route and flagged down a passing motorist, Joyce Ann Nixon, to ask for a ride.  By this point, the mother was visibly intoxicated.  Nixon drove mother and baby to the hospital and mother continued to display obvious signs of intoxication, as well as other erratic behavior.  Medical

personnel also had concerns that mother did not hold the baby with adequate support and would drop the baby.

{¶55} Meanwhile, the father returned to the family's cabin with the three-year-old child, but failed to realize that mother had not walked behind him until he returned to the cabin and discovered that she and the baby were not nearby. The father, for the entirety of the approximately 30-minute walk to the cabin, did not look to ensure that the rest of his family was safely following behind.

{¶56} Eventually, a sheriff's deputy located father and took him to the hospital. When father arrived at the hospital, he did not appear to be overly concerned about mother's state, or her ability to care for the baby while in that state. The father asserted that he did not believe that the mother was intoxicated. However, every other person who observed mother with the baby that evening believed the mother's intoxication to be obvious and her handling of the baby to be dangerous. Furthermore, mother had a .225 blood-alcohol concentration, which is almost triple the legal driving limit. *See* R.C. 4511.19(A)(1)(b).

{¶57} Additionally, the agency caseworker testified that she searched the state database that contained child-welfare records

and learned that mother has an alcohol problem and she previously had other children removed from her care. *See In re Matsko*, 11th Dist. Lake No. 2006-L-230, 2007-Ohio-2060, ¶ 29 ("[w]hile incidents of intoxication by a parent may be insufficient to establish her children's dependency, evidence of untreated alcoholism or drug addiction can"); *In re Nicholas P.*, 169 Ohio App.3d 570, 2006-Ohio-6213, 863 N.E.2d 1102, ¶ 17 (6th Dist.) ("[i]f a parent has ever had a child involuntarily removed, a subsequently born child may be automatically deemed 'dependent' from birth"). The evidence adduced at the hearing also showed that father works around eight hours per day and, during this time, the children are in mother's care.

**{¶58}** Based upon the totality of the clear and convincing evidence presented at the hearings in the case sub judice, we believe that the trial court could have properly formed a firm conviction that the children are dependent. Even though most of the evidence concerned the events that occurred during a single night in November 2021, the events from that night reflect that the parents exhibited poor decision-making skills and placed their children at risk. Moreover, given the parents' poor decision-making skills and the mother's obvious signs of intoxication (coupled with history of alcohol abuse and other

SCIOTO, 22CA3991

children's removal from her care), the trial court justifiably could have concluded that the parents' conduct adversely affects the children's condition or environment. If the father did not believe that the mother was intoxicated during that one November night, in view of the fact that all of the other witnesses who observed the mother that night testified that she obviously was intoxicated and handled the baby in a dangerous method, then the court could have decided that the father would be unable to recognize future dangers that the mother's conduct posed to the children.

{¶59} Moreover, even though most of the evidence adduced at the hearing related to one particular evening, as we frequently have remarked: "'[T]he child does not first have to be put into a particular environment before a court can determine that [the] environment is unhealthy or unsafe. * * * The unfitness of a parent, guardian or custodian can be predicted by past history.'" *In re Burchfield*, 51 Ohio App.3d 148, 156-57, 555 N.E.2d 325 (4th Dist.1988), quoting *In re Bishop*, 36 Ohio App.3d 123, 126, 521 N.E.2d 838 (5th Dist.1987) (citations omitted).

{¶60} In the case at bar, (1) the mother's history of alcohol abuse and having children removed from her care, and (2) the father's failure to recognize the mother's level of

intoxication before he let her walk alone, at night on a dark road and with his ten-month-old child, indicate that the children's welfare would be at risk if the court did not adjudicate the children dependent, and thereby, permit appellee to intervene.

**{¶61}** Furthermore, courts have recognized that:

"'*** [A] child should not have to endure the inevitable to its great detriment and harm in order to give the [parent] an opportunity to prove her suitability. To anticipate the future, however, is at most, a difficult basis for a judicial determination. The child's present condition and environment is the subject for decision not the expected or anticipated behavior of unsuitability or unfitness of the [parent]. * * * The law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm.'"

*Bishop*, 36 Ohio App.3d at 126, quoting *In re East*, 32 Ohio Misc. 65, 69, 288 N.E.2d 343 (C.P.1972).

**{¶62}** Consequently, after our review of the evidence we do not believe that the trial court's decision to adjudicate the children dependent – and thereby permit the state to intervene in order to protect the children's welfare – is against the manifest weight of the evidence.

D

**{¶63}** Appellants also contend that the trial court's neglect adjudication is against the manifest weight of the evidence.

{¶64} We believe, however, that any error that the trial court may have committed by adjudicating the children neglected constitutes harmless error that we must disregard. Civ.R. 61 states that we must "disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." An error affects a party's substantial rights when the error is prejudicial, i.e., the error affected the outcome of the proceeding. *E.g., State v. Jones*, 160 Ohio St.3d 314, 2020-Ohio-3051, 156 N.E.3d 872, ¶ 18; *State v. Butcher*, 4th Dist. Athens No. 15CA33, 2017-Ohio-1544, ¶ 48; *accord Cappara v. Schibley*, 85 Ohio St.3d 403, 408, 709 N.E.2d 117 (1999) (reviewing court must affirm if "the jury or other trier of the facts would probably have made the same decision" absent the error).

{¶65} In the case at bar, as we previously determined, the evidence adequately supports a finding under R.C. 2151.04(C) that the children are dependent. This finding alone authorized the trial court to proceed to disposition. *See* R.C. 2151.35(A)(1) (listing abuse, neglect, or dependency as independent alternatives and not requiring more than one finding to authorize a trial court to proceed to disposition). Consequently, any additional neglect adjudication is

superfluous.  Moreover, we are unaware of any prejudicial

effects of a superfluous neglect adjudication.  Therefore, any

error that the trial court may have made by adjudicating the

children neglected would be harmless error that we must

disregard.  *See* R.C. 2501.02 (appellate courts review for

prejudicial error); Civ.R. 61 (courts "must disregard any error

or defect in the proceeding which does not affect the

substantial rights of the parties"); App.R. 12(B) (reviewing

court may reverse trial court's judgment if it finds prejudicial

error).

{¶66} Accordingly, based upon the foregoing reasons, we

overrule appellants' assignment of error and affirm the trial

court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the appeal be affirmed and that appellee recover of appellants the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hess, J. & Wilkin, J.: Concur in Judgment & Opinion

For the Court

BY:_____

Peter B. Abele, Judge

NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.